Kevin PHILLIPS, an individual, Plaintiff,

v.

C.R. BARD, INC., a foreign corporation,
Bard Peripheral Vascular, Inc.,
Defendants.

No. 3:12–cv–00344–RCJ–WGC.

United States District Court,
D. Nevada.

March 29, 2013.

Order Denying Reconsideration
Aug. 7, 2013.

Julia N. Reed Zaic, Heaviside Reed Zaic, A Law Corporation, Laguna Beach, CA, Peter C. Wetherall, White & Wetherall, Las Vegas, NV, Ramon R. Lopez, Troy A. Brenes, Lopez McHugh LLP, Newport Beach, CA, for Plaintiff.

James F. Rogers, Nelson Mullins Riley & Scarborough, Columbia, SC, Jay Joseph Schuttert, Justin S. Hepworth, Kelly A. Evans, Snell & Wilmer L.L.P., Las Vegas, NV, Matthew B. Lerner, Richard B. North, Jr., Taylor Tapley Daly, Nelson Mullins Riley & Scarborough LLP, Atlanta, GA, for Defendants.

## ORDER RE BARD'S ASSERTION OF THE ATTORNEY–CLIENT PRIVILEGE AND WORK PRODUCT DOCTRINE AS TO FORTY–THREE JOINT SELECTION DOCUMENTS

WILLIAM G. COBB, United States Magistrate Judge.

In this order, the court will undertake a review of the assertion of the attorney-client privilege and work product doctrine by Defendants C.R. Bard, Inc., and Bard Peripheral Vascular, Inc. (collectively, "Bard") as to certain documents generated by Bard, the production of which is sought by Plaintiff Kevin Phillips. Additionally, collateral issues associated with Bard's document production, including the adequacy of Bard's privilege log and waiver have also been submitted to the court. After multiple hearings and extensive briefing on the issues attendant to Bard's assertion of the attorney-client privi-

lege and work product doctrine, the court issues the instant Order.

## I. BACKGROUND OF LITIGATION

This product liability action arises from the alleged failure of a medical device called the "Recovery Filter System" ("Recovery Filter") manufactured by Bard. The Recovery Filter is a vena cava filter designed to be surgically implanted to prevent pulmonary embolisms from reaching the patient's lungs. Plaintiff avers he underwent surgical implantation of the Recovery Filter in August 2005. According to Plaintiff, the Recovery Filter subsequently failed and migrated to his heart, causing him to undergo extensive medical treatment and care, including emergency open heart surgery on April 30, 2010.

Plaintiff alleges that the Recovery Filter is defectively designed because it has much higher rates of migration and fracture and associated injuries, including fatalities, than does Bard's predecessor device and/or other comparable filters. Plaintiff further claims that Bard failed to establish and maintain minimum industry safety standards to ensure that the Recovery Filter was designed to be reasonably safe when used in an intended and reasonably foreseeable manner. Plaintiff contends Bard failed to meet minimum industry safety standards regarding establishing and maintaining a post-market surveillance system to investigate and track and trend reported adverse events, and failed to take timely and reasonable corrective and/or preventative action once the unreasonably dangerous nature of the Recovery Filter was discovered or should have been discovered.

Lastly, Plaintiff claims that Bard was aware of the alleged design defect in the Recovery Filter in advance of August 2005, when Plaintiff underwent implantation of the device. Plaintiff avers that Bard has never adequately warned of and has made material misrepresentations to consumers regarding the risks associated with the intended and reasonable use of the Recovery Filter.

Bard introduced the Recovery Filter into the market in late 2002 after it was cleared by the United States Food and Drug Administration ("FDA"). As a defense, Bard contends the risks of fracture, migration, perforation, and tilt are known and well-documented risks with not only its but all inferior vena cava (IVC) filters. Bard cites statistics that filter migration has been reported in eighteen percent of patients who receive IVC filters and that the occurrences of migration with its Recovery Filter are below that percentage. Bard argues that despite the acknowledged risk of complications with IVC filters, most physicians agree that the benefits outweigh the risks inherent in the device because IVC filters provide critical protection against potentially life-threatening pulmonary emboli and related clotting problems.

Bard further asserts that simply because a filter migrates or fractures does not mean it is defective. Finally, Bard contends that Plaintiff's claims are barred, in whole or in part, by the application of Comment K to Restatement (Second) of Torts § 401A.

## II. CASE MANAGEMENT: Discovery and Bard's Assertion of Attorney– Client Privilege and Work Product Doctrine

Numerous case management status reports have been filed, conferences held, and orders entered up to this point in this litigation. (See, e.g., Docs. ## 31, 32, 36, 46, 48, 68 and 77.) The issue of the assertion of attorney-client privilege and work product doctrine relative to Bard's document production was first brought to the court's attention in the parties' Joint Case Management Report. (Doc. # 31 at 32–33.) At that time, the parties noted that several other similar Recovery Filter cases are pending throughout the United States, including one where Bard has produced over two million pages of documents. (Id. at 10–14). Bard has reduplicated its document productions in this litigation (and also responses to Plaintiff's request for production of documents) from a predecessor case. As relevant to this Order, Bard's production in this matter includes multiple privilege logs which extend over 500 pages with claims of attorney-client privilege or work product doctrine being asserted as to approximately 6800 documents. (See Dec.

12, 2012 Joint Case Management Report, Doc. # 36 at 5–9.) [1]

Despite the parties' efforts to resolve their differences, the production of supplemental privilege logs, and numerous status conferences, they requested the court's guidance on these issues. (*See* Doc. # 48.) At a status conference on January 17, 2013, the court requested briefing on the issues that remain in dispute and asked the parties to identify categories of documents which generalize the assertions of privilege or protection, and to submit fifty representative documents along with their briefing which illustrate the parties' contentions and positions. (*See* Doc. # 46.)

In compliance with the court's request, the parties submitted extensive briefing. (*See* Docs. ## 52, 54, 63, 64.) Unfortunately, the parties could not agree on the relevant categories of documents and submitted separate identification lists. (Doc. # 52, Attachments 1 & 2 (Exhibits A & B).) Nevertheless, Plaintiff provided Bard with his list of fifty representative selections, which appear in Document Number 60. [2] The representative documents have been labeled as "Joint Selection" documents. Bard then submitted these fifty documents to the court for its *in camera* review. [3]

Next, the court conducted two lengthy status conferences regarding the parties' multiple discovery disputes. The first conference, conducted on February 22, 2013, was limited to a discussion of ESI issues, which have been resolved and are the subject of an Interim Case Management Order. (*See* Docs. ## 68, 77.) The second conference, conducted on March 1, 2013, addressed the attorney-client privilege and work product

doctrine issues which are the subject of the instant Order. (*See* Minutes, Doc. # 75.)

Although the court announced certain of its conclusions at the conference on March 1, 2013, this Order will address all of the attorney-client privilege and work product doctrine issues now before the court.

### III. LEGAL STANDARD

The analysis of Bard's assertion of attorney-client privilege and work product doctrine as to certain of its documents presents a somewhat daunting task, particularly in light of the large volume of documents to which these assertions have been made. The court is faced with determining under what circumstances a communication to or from a corporate client is insulated under the attorney-client privilege or when a document might be protected from disclosure under the work product doctrine. The court will discuss the law pertaining to these two shields in that order, and will then address some preliminary matters before turning to an analysis of the Joint Selection documents.

### A. Attorney–Client Privilege

#### 1. Choice of Law

Federal Rule of Evidence 501 provides, "in a civil case, state law governs privilege regarding a claim or defense for which state law supplies the rule of decision."

Thus, the court must first determine what law should be applied to properly analyze the attorney-client privilege. Both parties generally agree that in a case where the court's jurisdiction is based on diversity, as it is here, state law governs the applicable elements of attorney-client privilege. However,

1. Bard subsequently withdrew its privilege claim to approximately 20% of its document production and now claims that it is asserting the attorney-client privilege and work product doctrine with respect to 4700 documents and files, which Bard claims is slightly less than 1.5% of approximately 325,000 documents produced by Bard. (Docs. ## 48 at 6, 52 at 2.)

2. This list superseded one initially submitted by Plaintiff on February 15, 2013. (*See* Doc. # 51.)

3. Bard subsequently withdrew its attorney-client privilege and/or work product doctrine asser-

tions as to Joint Selections 2, 4, 11, 18, 28, 31 and 41. (Doc. # 52 at 18.) After they were withdrawn as privileged or otherwise protected, they were apparently produced to Plaintiff and Plaintiff submitted them to the court for *in camera* inspection, claiming they serve to demonstrate the claimed deficiencies in Bard's privilege logs. Because Bard characterized these documents as "confidential," Plaintiff requested the court receive them under seal. (Doc. # 55; *see also* order sealing at Doc. # 81.)

they take different routes to reach this conclusion.

Plaintiff asserts that in accordance with Federal Rule of Evidence 501, Nevada law is applicable. (Doc. # 54 at 14.) Bard agrees, but suggests that because most of the communications at issue were made by attorneys in New Jersey to employees of Bard in Arizona, it is possible that Arizona or New Jersey law should govern this dispute. (Doc. # 52 at 8 n. 9.) Nonetheless, Bard recognizes that under New Jersey, Arizona, and Nevada law, the basic substantive elements of the attorney-client privilege are the same; therefore, Nevada law should apply. (*Id.* at 8.) "[U]nder each state's law, confidential communications between an attorney and client made for the purpose of giving or receiving legal advice are privileged." (*Id.*, citing Nev.Rev.Stat. 49.095, A.R.S. 12–2234; N.J.S.A. 2A:84A–20; N.J.R. Evid. 504.)

Federal courts sitting in diversity apply the choice of law rule of the state in which it sits. *See Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Applying Nevada's choice of law principles, and with no conflict among the laws of these states, Nevada law should apply. *See Tri–County Equip. & Leasing v. Klinke,* 286 P.3d 593, 595 (Nev.2012) (citations and quotation marks omitted) ("A conflict of law exists when two or more states have legitimate interests in a particular set of facts in litigation, and the laws of those states differ or would produce different results in the case.").

The court will endeavor to apply and construe the substantive Nevada law on attorney-client privilege to the pending dispute. That being said, Nevada Supreme Court pronouncements in this area are sparse, which further complicates the task confronting the court. As will be discussed below, in the absence of controlling Nevada law, the court must look to decisional law in the Ninth Circuit, or if there is no law on point in the circuit, to other circuits or district courts.

### 2. The Attorney–Client Privilege in General

"The attorney-client privilege is the oldest of the privileges for confidential communica-

tions" and "[i]ts purpose is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Upjohn Co. v. United States,* 449 U.S. 383, 389, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981) (citation omitted).

In Nevada, the attorney-client privilege is codified in Nevada Revised Statute 49.095 which provides:

A client has a privilege to refuse to disclose, and to prevent any other person from disclosing, confidential communications:

1. Between himself or his representative and his lawyer or his lawyer's representative;

2. Between his lawyer and the lawyer's representative;

3. Made for the purpose of facilitating the rendition of professional legal services to the client, by him or his lawyer to a lawyer representing another in a matter of common interest.

Under Nevada Revised Statute 49.055, a communication is confidential if "it is not intended to be disclosed to third persons other than those to whom disclosure is in furtherance of the rendition of professional legal services to the client or those reasonably necessary for the transmission of the communication." A "representative of a client" is "a person having authority to obtain professional legal services, or to act on advice rendered pursuant thereto, on behalf of the client." Nev.Rev.Stat. 49.075. The Nevada Supreme Court has held that the attorney-client privilege should be narrowly construed because it obstructs the search for truth. *See Whitehead v. Comm'n on Jud. Discipline,* 110 Nev. 380, 873 P.2d 946, 968 (1994).

Corporations, of course, may invoke the attorney-client privilege. *See Upjohn,* 449 U.S. at 389–390, 101 S.Ct. 677. However, applying the attorney-client privilege in the corporate context is complicated because corporations are fictitious entities that may only speak through their agent officers and employees. *See id.* at 390, 101 S.Ct. 677 ("[a]dmittedly complications in the application of the privilege arise when the client is a corpo-

ration, which in theory is an artificial creature of the law, and not an individual"); *see also Henderson Apartment Venture, LLC v. Miller*, No. 2:09–cv–01849–HDM–PAL, 2011 WL 1300143, at *9 (D.Nev. Mar. 31, 2011) ("there are special problems arising in applying the attorney-client privilege in a corporate context" because "[c]orporations can seek and receive legal advice and communicate with counsel only through individuals empowered to act on their behalf"); *Wardleigh v. Second Jud. Dist. Ct.*, 111 Nev. 345, 891 P.2d 1180, 1184 (1995) (citation omitted) ("difficulties arise in attempting to apply the attorney-client privilege in a corporate setting"). In this realm, it is important to remember that "the privilege exists to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice." *Upjohn*, 449 U.S. at 390, 101 S.Ct. 677.

As indicated above, the Nevada Supreme Court's pronouncements in the area of attorney-client privilege are limited. In *Wardleigh*, Nevada adopted the United States Supreme Court's holding in *Upjohn Co. v. United States*, 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981). The Nevada Supreme Court found the attorney-client privilege may be asserted by a corporation, but rejected the "control group" test which only applied the privilege to a select group of managerial corporate employees. *See Wardleigh*, 891 P.2d at 1184–85 (citations omitted). Instead, the Nevada Supreme Court, like the United States Supreme Court in *Upjohn*, focuses on the nature of the subject matter sought in discovery for purposes of applying the attorney-client privilege. *Id.*

In this regard, Nevada has followed the United States Supreme Court in holding that "only *communications* and not *facts* are subject to the privilege." *Id.* at 1184. "Thus, relevant facts known by a corporate employee of any status in the corporation would be discoverable even if such facts were related to the corporate attorney as part of the employee's communication with counsel." *Id.* "The communication itself, however, would remain privileged." *Id.*

By way of example, in *Upjohn* the corporation's in-house counsel directed that questionnaires be submitted to employees in order to provide him with information he needed to give legal advice to the corporation. The Supreme Court held that the government could not seek discovery of the questionnaire responses that were provided to in-house counsel, but "was free to question the employees who communicated with [in-house] and outside counsel" regarding the facts. *Upjohn*, 449 U.S. at 396, 101 S.Ct. 677. The Supreme Court also provided another example from a district court which helps to understand this distinction:

[T]he protection of the privilege extends only to *communications* and not to facts. A fact is one thing and a communication concerning that fact is an entirely different thing. The client cannot be compelled to answer the question, 'What did you say or write to the attorney?' but may not refuse to disclose any relevant fact within his knowledge merely because he incorporated a statement of such fact into his communication to his attorney.

*Id.* at 395–96, 101 S.Ct. 677 (quoting *Philadelphia v. Westinghouse Elec. Corp.*, 205 F.Supp. 830, 831 (E.D.Pa.1962)).

The Nevada Supreme Court has also held that "a documents transmitted by e-mail is protected by the attorney-client privilege as long as the requirements of the privilege are met," which is determined by looking at the content and recipients of the e-mail. *Reno v. Reno Police Protective Assoc.*, 118 Nev. 889, 59 P.3d 1212, 1218 (2002) (citations omitted).

In *Cheyenne Const., Inc. v. Hozz*, 102 Nev. 308, 720 P.2d 1224 (1986), the Nevada Supreme Court noted, "[i]f there is a disclosure of privileged communications, this waives the remainder of the privileged consultation on the same subject." *Id.* at 1226. However, "acts or services performed by an attorney for his client in the course of employment and which are accessible to others or to the public do not fall within the privilege because no private communication is involved." *Id.* (citations omitted). There, a party's attorney took the stand to testify regarding his dealings with another party on a construction project. *Id.* The Nevada Supreme Court held that this testimony was not a private communication that came within the attor-

ney-client privilege. *Id.* Instead, it held that the attorney was not testifying about privileged communications so as to waive the disclosure of the rest of a privileged communication on that same topic. *Id.* at 1227. The attorney's advice to his client regarding that topic would therefore remain confidential.

There is unfortunately little other Nevada case law that defines the contours of the attorney-client privilege in the corporate setting. The case law in this area that does exist does not assist the court with the determinations that need to be made in this matter, including whether the communication invokes the privilege, *i.e.,* whether it was made for the purpose of securing or soliciting legal advice, for a business purpose, or both; applying the privilege to communications made to or from in-house counsel and to or from consultants; applying the privilege to communications made to outside counsel in the corporate context; and applying it to communications among non-attorney corporate employees which may discuss legal advice.

In the absence of controlling law, the court must look to decisional law in the Ninth Circuit, district courts in the Ninth Circuit, and in some circumstances, other circuits and district courts outside of the Ninth Circuit to provide a framework for approaching these issues. *See Takahashi v. Loomis Armored Car Serv.,* 625 F.2d 314, 316 (9th Cir.1980) (citations omitted) ("In the absence of controlling forum state law, a federal court sitting in diversity must use its own best judgment in predicting how the state's highest court would decide the case. In so doing, a federal court may be aided by looking to well-reasoned decisions from other jurisdictions."); *see also U.S. v. Bibbins,* 637 F.3d 1087 (9th Cir.2011) (citing *Takahashi,* 625 F.2d at 316) (in the absence of Nevada law, the court looked to decisions in other jurisdictions).

The parties appear to agree that a communication sent only *to* legal counsel or from *legal counsel,* requesting or rendering legal advice is privileged, but unfortunately, there is not much else they agree on with respect to the parameters of the attorney-client privilege in the corporate context. The court will therefore discuss the law applicable to the various categories of documents which char-

acterize the different documents to which the attorney-client privilege has been asserted.

### 3. Burden of Establishing the Attorney–Client Privilege

There is no dispute that the party asserting the privilege must make a *prima facie* showing that the privilege protects the information the party intends to withhold. (*See* Pl.'s Mem., Doc. # 54 at 10; Bards' Mem., Doc. # 52 at 7, each citing *In re Grand Jury Investigation,* 974 F.2d 1068, 1070–71 (9th Cir.1992).) This burden is met by demonstrating that the document satisfies the essential elements of the attorney-client privilege. *See In re Grand Jury Investigation,* 974 F.2d at 1070–71. While there are various means by which this may be accomplished, typically, a party will attempt to satisfy this burden by submitting a privilege log. *Id.* at 1071 (citation omitted) ("We have previously recognized a number of means of sufficiently establishing the privilege, one of which is the privilege log approach."). The Ninth Circuit has found a privilege log which contains the following information to be sufficient: "(a) the attorney and client involved, (b) the nature of the document, (c) all persons or entities shown on the document to have received or sent the document, (d) all persons or entities known to have been furnished the document or informed of its substance, and (e) the date the document was generated, prepared, or dated." *Id.* (citing *Dole v. Milonas,* 889 F.2d 885, 888 n. 3 (9th Cir.1989)).

Bard has submitted a privilege log (actually four privilege logs), but Plaintiff contends that as to many of the entries, the logs are insufficient or unsatisfactory. The court will address that contention below. (*See infra* at IV.A.)

### 4. Application of Attorney–Client Privilege and Work Product Doctrine Principles to the Present Case

### (a) Communications Between Bard and its Attorneys that Relate to Business Affairs

### I. "Primary Purpose" vs. "Because Of" Standards

Plaintiff argues that communications between Bard and its attorneys relating to

business affairs are not privileged, unless the "primary purpose" of the communication is for securing legal advice. (Doc. # 54 at 15; Doc. # 64 at 6–7.)

Bard acknowledges that communications by corporate counsel that provide strictly business advice are not protected by the attorney-client privilege. (Doc. # 52 at 10:23–24.) It argues, however, that "dual purpose" documents, i.e., those seeking or providing *both* business and legal advice, are protected by the attorney-client privilege if, based on the totality of the circumstances, it can fairly be said based on the nature of a document that it was primarily created for the purpose of giving or receiving legal advice. (Doc. # 52 at 10–11.) Bard claims that this *"because of"* standard, which was articulated by the Ninth Circuit in the work product doctrine context (*see In re Grand Jury Subpoena, Mark Torf/Torf Envtl. Mgmt. ("Torf"),* 357 F.3d 900, 908 (9th Cir.2004)), supplants the "primary purpose" standard for determining whether a dual purpose document is privileged. (Doc. # 52 at 11, n. 11.)

In his response, Plaintiff argues that it is the "primary purpose" test and not the "because of" standard that governs dual purpose communications in the attorney-client privilege context. (*See* Doc. # 64 at 6.)

In *Upjohn,* the Supreme Court stated that in order for the attorney-client privilege to apply, the communications at issue must have been made for the purpose of securing legal advice. *Upjohn,* 449 U.S. at 394, 101 S.Ct. 677. As an extension of this, when dealing with communications to or from in-house counsel, many courts have found that in order for a communication that pertains to both business and legal advice to be considered privileged, the "primary purpose" must be to obtain or give legal advice. *See, e.g., U.S. v. Salyer,* 853 F.Supp.2d 1014, 1018 (E.D.Cal. 2012); *Henderson,* 2011 WL 1300143; *Premiere Digital Access, Inc. v. Central Telephone Co.,* 360 F.Supp.2d 1168 (D.Nev.2005); *United States v. ChevronTexaco Corp.,* 241 F.Supp.2d 1065 (N.D.Cal.2002); *United States v. Chevron Corp.,* No. C 94–1885 SBA, 1996 WL 264769 (N.D.Cal. Mar. 13, 1996), *as amended* in 1996 WL 444597 (N.D.Cal. May 30, 1996).

In *United States v. ChevronTexaco Corp.,* the court explained that in-house attorneys are often very involved in the company's business, but the attorney-client privilege does not apply when the attorney is providing strictly business advice. *United States v. ChevronTexaco Corp.,* 241 F.Supp.2d at 1076. Thus, when a party seeks to apply the attorney-client privilege to a communication involving in-house counsel, it must demonstrate that the "primary purpose" of the communication was to obtain or provide *legal* advice. *Id.*

When judges have had occasion to address this issue in the District of Nevada, they have applied the "primary purpose" standard. *See Henderson,* 2011 WL 1300143 at *9; *Premiere,* 360 F.Supp.2d 1168 ("[W]here, as here, the primary purpose of the communication is to discern the legal ramifications of a potential course of action, that communication is for a 'legal' purpose.").

In *Henderson,* Magistrate Judge Leen emphasized that "[c]ommunications by corporate counsel providing business advice are not covered by the [attorney-client] privilege." *Id.* at *9. However, when a communication involves both business and legal advice, the privilege will apply if, "the primary purpose of the communication is [to] discern the legal ramifications of a potential course of action[.]" In addition, Magistrate Judge Leen pointed out that communications between corporate employees and in-house counsel must be intended to be confidential, *i.e.,* "not intended to be disclosed to third persons other than those to whom disclosure is in furtherance of the rendition of professional legal services to the client or those reasonably necessary for the transmission of the communication." *Id.* (quoting Nev.Rev. Stat. 49.055). Finally, she indicated that such communications "must be made with knowledge that [the employees] are speaking to in-house counsel for the purpose of securing legal advice." *Id.*

On the other hand, some district courts in the Ninth Circuit have utilized the "because of" standard in the attorney-client privilege context. For example, in *In re CV Therapeutics, Inc. Securities Litigation.,* No. C–

03–3709 SI (EMC), 2006 WL 1699536 (N.D.Cal. June 16, 2006), the court employed the "because of" standard utilized in connection with the work product doctrine, and rejected utilization of the "primary purpose" standard, opining that the "primary purpose" test may have been replaced or refined by the "because of" standard. *Id.* at *3 (citing *Visa U.S.A., Inc. v. First Data Corp.*, No. C–02–1786JSW(EMC), 2004 WL 1878209, at *4 (N.D.Cal. Aug. 23, 2004) (citing *Torf,* 357 F.3d 900 (9th Cir.2004))). Relying on *Torf,* the court described the "because of" standard as follows: "if 'in light of the nature of the document and the factual situation in the particular case, the document can be fairly said to have been prepared or obtained *because of* the prospect of litigation.' " *Id.* (quoting *Torf,* 357 F.3d at 907). It went on to explain that this standard does not look at "whether litigation was a *primary or secondary motive* behind the creation of a document." *Id.* (quoting *Torf,* 357 F.3d at 907). Instead, "it considers the totality of the circumstances and affords protection when it can fairly be said that the 'document was created because of anticipated litigation, and would not have been created in substantially similar form but for the prospect of that litigation.' " *Id.*

In *In re CV Therapeutics,* the court noted that *Torf* involved the work product doctrine, and not attorney-client privilege, but nevertheless decided to apply the "because of" standard to attorney-client privilege, finding that "parallel issues arise in both contexts where dual purpose documents are involved." *In re CV Therapeutics,* 2006 WL 1699536, at *4. In doing so, it considered "the totality of the circumstances" and its central inquiry was on the extent to which the communication was soliciting or providing legal advice. *Id.*

Nevertheless, given that the Ninth Circuit has not expressly ruled that the "because of" test has supplanted the "primary purpose" test in the attorney-client privilege context, the court will continue to adhere to the "primary purpose" test as other judges in this district have done. *See Henderson,* 2011 WL 1300143; *Premiere,* 360 F.Supp.2d at 1174.

Whether or not the court applies the "primary purpose" test or the "because of" test, it is clear that the court's main focus is to look at the extent to which the communication solicits or provides legal advice. In that respect, *In re CV Therapeutics* actually provides an instructive framework for assessing privilege claims for dual purpose communications even under the "primary purpose" standard. It suggests that the court examine the "context of the communication and content of the document" and take "into account the facts surrounding the creation of the document and the nature of the document." *Id.* The court should also ascertain "whether the legal purpose so permeates any non-legal purpose 'that the two purposes cannot be discretely separated from the factual nexus as a whole.' " *Id.* (quoting *Torf,* 357 F.3d at 910). The court will also take into account "the breadth of the recipient list in assessing the centrality of potential legal advice generated by the communication" and "whether a communication explicitly sought advice and comment." *Id.* All of these factors may be assessed in making an ultimate determination as to whether the "primary purpose" of the communication was to generate legal advice. This is in accord with the "primary purpose" standard, which Plaintiff acknowledges requires the court to look at "whether the purpose of the communication was for primarily legal reasons, or [whether] there were other business related reasons involved (Doc. # 64 at 7:16–17.)

### ii. Simultaneous Review and Copying Counsel

Plaintiff also argues that when a business sends communications to both lawyers and non-lawyers for simultaneous review, it cannot claim that the "primary purpose" was for legal advice or assistance because the communications served both business and legal purposes. (Doc. # 54 at 15, citing *In re Vioxx Prods. Liab. Litig.,* 501 F.Supp.2d 789, 805 (E.D.La.2007); *In re Seroquel Prods. Liab. Litig.,* No. 6:06–md–1769–Orl–22DAB, 2008 WL 1995058 (M.D.Fla. May 7, 2008); *United States v. Int'l Bus. Machines Corp.,* 66 F.R.D. 206, 213 (S.D.N.Y.1974); *United States v. Chevron Corp.,* 1996 WL 264769.) Plaintiff further asserts that merely copying

or "cc-ing" legal counsel, in and of itself, is insufficient to trigger the privilege. (Doc. # 54 at 15, citing *United States v. Chevron-Texaco,* 241 F.Supp.2d 1065, 1075 (N.D.Cal. 2002); *Anaya v. CBS Broadcasting, Inc.,* 251 F.R.D. 645, 654 (D.N.M.2007).)

It is true that some courts have held that a company cannot claim the "primary purpose" of a communication was to solicit legal advice when it is sent to both lawyers and non-lawyers for simultaneous review. *See, e.g., United States v. Chevron Corp.,* 1996 WL 264769, at *3 (citing *United States v. IBM Corp.,* 66 F.R.D. 206 (S.D.N.Y.1974); *North Carolina Elec. Membership Corp. v. Carolina Power & Light Co.,* 110 F.R.D. 511, 514 (M.D.N.C.1986)). However, the court will not make a *per se* ruling in this regard. Instead, it will review each communication at issue, including those purportedly sent to lawyers and non-lawyers for simultaneous review, and will attempt to determine whether the "primary purpose" was to solicit legal advice.

■ Finally, the court agrees that merely copying or "cc-ing" legal counsel, in and of itself, is not enough to trigger the attorney-client privilege. Instead, each element of the privilege must be met when the attorney-client privilege is being asserted, and the court will review each communication at issue with this in mind.

### (b) Communications With Counsel Regarding Compliance with Regulations

Plaintiff argues that internal communications within FDA-regulated companies, like Bard, which relate to general business matters, such as technical, scientific, promotional, management, regulatory or marketing matters, are generally *not* found to have been made for the "primary purpose" of seeking legal advice. (Doc. # 54 at 15, citing *In re Vioxx Prods. Liab. Litig.,* 501 F.Supp.2d at 811–12; *In re Seroquel Prods. Liab. Litig.,* 2008 WL 1995058.)

Bard, on the other hand, asserts that it relies on its attorneys to guide it through the hurdles imposed on it by the complex regulatory framework mandated by the FDA and other agencies. (Doc. # 52 at 12.) Thus, it asserts that when attorneys provide it with advice on how to comply with the law, the attorney-client privilege applies. (*Id.*) It claims that this is the case even if the corporation also enlists the services of nonlawyers to provide the same advice. (*Id.*, citing *United States v. ChevronTexaco Corp.,* 241 F.Supp.2d at 1076.) It argues that such communications are privileged even if they pertain to non-privileged matters, if disclosure of the non-privileged matters would reveal the substance of the privileged material. (*Id.* at 12–13, relying on *Segerstrom v. United States,* No. C00–0833 SI, 2001 WL 283805, at *4 (N.D.Cal. Feb. 6, 2001); *In re Fischel,* 557 F.2d 209, 212 (9th Cir.1977).)

Plaintiff asserts that this argument has been rejected on numerous occasions because it would allow medical device or pharmaceutical companies to shield from discovery virtually all internal communications by simply including in-house counsel or using them as a conduit for redistribution of communications. (Doc. # 64 at 9, relying on *In re Vioxx Prods. Liab. Litig.,* 501 F.Supp.2d at 805; *In re Seroquel Prods. Liab. Litig.,* 2008 WL 1995058; and *In re Avandia Mktg,* No. 07–md–01871, 2009 WL 4641707 (E.D.Pa. Dec. 7, 2009).)

The court does not necessarily disagree with Bard's proposition that attorneys may counsel their clients regarding how to comply with the law and their advice in this regard is generally protected by the attorney-client privilege. However, the court agrees with Plaintiff that unless Bard establishes that the *primary purpose* of a communication which also relates to business operations was to obtain or provide legal advice, these communications should *not* be shielded from discovery based on the attorney-client privilege. The theory Bard is advocating here is exactly what Merck advanced in *In re Vioxx Products Liability Litigation:* "because the drug industry is so extensively regulated by the FDA, virtually everything a member of the industry does carries potential legal problems vis-à-vis government regulators." *See In re Vioxx Prods. Liab. Litig.,* 501 F.Supp.2d at 800. There the court noted that it appreciated how extensive regulation

could turn services that appeared to be non-legal in nature (*i.e.*, editing television ads and promotional materials) into legal advice; however, this did not change the fact that the court still had to determine whether legal advice was the "primary purpose" behind the services provided. *Id.* The court explained:

> Without question, the pervasive nature of governmental regulation is a factor that must be taken into account when assessing whether the work of the in-house attorneys in the drug industry constitutes legal advice, but those drug companies cannot reasonably conclude from the fact of pervasive regulation that virtually everything sent to the legal department, or in which the legal department is involved, will automatically be protected by the attorney-client privilege.

*Id.* at 800–801. This would "effectively immunize most of the industry's internal communications" because everything leaving the company has to go through the legal department for review, comment and approval. *Id.* at 801. The ultimate conclusion is that this theory may indeed protect some documents from discovery, but it is nevertheless the burden of the withholding party to demonstrate that the "primary purpose" was the rendering of legal advice on a document-by-document basis. *See id.* The court in *In re Seroquel Products Liability Litigation* came to similar a conclusion. *See In re Seroquel Prods. Liab. Litig,* 2008 WL 1995058, at *6–7.

As an example of the execution of this analysis, the court in *In re Vioxx Products Liability Litigation* determined that grammatical, editorial and word choice comments on documents such as scientific reports and articles were not considered protected by the attorney-client privilege because there was no indication that there was any legal significance to the comments. *In re Vioxx Prods. Liab. Litig.,* 501 F.Supp.2d at 802. On the other hand, the court considered privileged all communications to and from an attorney and among corporate attorneys that related to a response to an FDA warning letter when it found the communications were "primarily in furtherance of legal assistance" even when

an initial draft was prepared for the lawyer by a non-lawyer. *Id.*

### (c) Internal Corporate Communications Between Non–Lawyers That Discuss Legal Advice

Plaintiff asserts that for communications from non-attorneys to be privileged, the communications must seek legal advice from counsel or forward legal advice from legal counsel to non-attorneys who needed the advice to fulfill the purpose for which the lawyer was consulted or disclosure was reasonably necessary for the transmission of the communication. (Doc. # 54 at 16, 21; Doc. # 64 at 13, relying on *Henderson,* 2011 WL 1300143; Nev.Rev.Stat. 49.055; *United States v. Chevron Corp.,* 1996 WL 264769.)

Bard asserts that internal confidential communications between non-attorneys of a corporation that discuss the substance of privileged information are protected by the attorney-client privilege. (Doc. # 52 at 13, relying on *ChevronTexaco Corp.,* 241 F.Supp.2d at 1077; *Potter v. United States,* No. 02–CV–0632–H (POR), 2002 WL 31409613, at *5 (S.D.Cal. July 26, 2002); *McCook Metals LLC v. Alcoa, Inc.,* 192 F.R.D. 242, 254 (N.D.Ill.2000).)

The parties do not appear to be entirely at odds with respect to this issue. Again, the assertion of the attorney-client privilege to this category of communications will still require an analysis on a document-by-document basis. The court will have to determine, in each instance, whether the non-attorneys were seeking or forwarding legal advice to non-attorneys who needed it to fulfill the purpose for which the lawyer was consulted and/or that disclosure to other non-lawyer employees was reasonably necessary for the transmission of the communication.

### (d) Data and Information Requested by Counsel

Bard claims that when a corporate employee communicates or compiles data or information at the request of counsel, such communication or compilation of information should be protected by the attorney-client privilege. (Doc. # 52 at 13, relying on *Henderson,* 2012 WL 22302, at *5; *Potter,* 2002 WL 31409613, at *5.)

Plaintiff asserts that Bard cannot shield relevant and otherwise unprivileged data and information merely by sending it along to defense counsel. (Doc. # 64 at 15.) In addition, Plaintiff argues that the privilege does not extend to data and information that already existed and was merely forwarded to counsel. (*Id.* at 15–16.)

The court will have to determine whether data or information was prepared *at the direction of legal counsel* or whether it already existed and was simply forwarded to counsel for review. In doing so, however, the court will be mindful of the Nevada Supreme Court's admonitions in *Wardleigh* that a corporation's communications of "facts" are likely not protected, particularly in light of the court's further direction in *Whitehead* that the attorney-client privilege is to be narrowly construed.

### (e) Communications with Consultants Retained by Bard's Legal Counsel

This category may be the most contentious of the privilege assertions made by Bard, and possibly in the context of this litigation, the most significant.

Bard argues that when an outside consultant is retained by and acts at the direction of counsel on behalf of a corporation, communications with the consultant are privileged, if the consultant is retained to assist the attorney in rendering legal advice to the corporation. (Doc. # 52 at 14, relying on *United States v. Richey*, 632 F.3d 559, 566 (9th Cir.2011); *Residential Constructors, LLC v. Ace Prop. & Cas. Co.*, No. 2:05–cv–01318–BES–GWF, 2006 WL 3149362, at \*15–16 (D.Nev. Nov. 1, 2006); Nev.Rev.Stat. 49.075 (defining "representative" of a client).)

In addition, Bard claims that communications between an outside consultant and a corporation's attorneys are privileged if the consultant is the "functional equivalent" of an employee. (*Id.*, relying on *United States v. Graf*, 610 F.3d 1148, 1158–59 (9th Cir.2010); Nev.Rev.Stat. 49.075.) In *Graf*, the court found a consultant to be the "functional equivalent" of an employee when the consultant's relationship to the company is "of the sort that justifies application of the privi-

lege." Using this argument, Bard claims that to the extent its Law Department retained consultants, such as Dr. John Lehmann and Dr. Richard Holcomb, to provide services for the Law Department to be able to provide legal advice to Bard, communications with those consultants are privileged. (Doc. # 52 at 15.)

On the other hand, Plaintiff argues that Dr. Lehmann's communications were made for the purpose of conducting the general business of Bard and are not protected by the attorney-client privilege. Plaintiff notes that Dr. Lehmann was initially commissioned by corporate senior management, and his report was prepared as part of management's ongoing investigation of the Recovery Filter. (Doc. # 54 at 20.)

Plaintiff similarly argues that as another example, Richard Bliss was hired by Bard in early 2005 to become temporary head of its Quality Assurance Department, and was responsible for overseeing investigations into device failures, corrective and preventive actions, and to conduct quality audits. (Doc. # 54 at 20.) Plaintiff asserts that these are normal business activities, and so communications such as Joint Selections 27 and 28, from a nonlegal employee to Mr. Bliss and an engineer, cannot come within the attorney-client privilege or be protected work product. (*Id.*)

In its response, Bard maintains that the work conducted by Dr. Lehmann from November 2004 through March 2005, was at the direction and request of Bard's Law Department to assist it in providing legal advice to Bard and in anticipation of litigation. (Doc. # 63 at 8–9.) To that end, Bard has submitted the affidavit of Assistant General Counsel, Donna L. Passero, Esq. (*See* Doc. # 52–3.) Ms. Passero states that she, along with Bard's Law Department, retained Dr. Lehmann in early November of 2004, "for the purpose of providing outside consultation services to the Law Department regarding anticipated and ongoing product liability litigation." (*Id.* at 2 ¶ 6.) She goes on to declare that Dr. Lehmann was specifically "retained for the purpose of conducting an independent investigation and drafting a report concerning [the Filter], which [she]—in

conjunction with Bard's Law Department—requested for the purpose of providing Bard with legal advice concerning [the Filter] and to prepare for and assist with anticipated and ongoing litigation." (*Id.* at 2–3 ¶ 6.) Ms. Passero asserts that she informed Dr. Lehmann that he had been retained in this capacity, and that she instructed him regarding confidentiality: "the results of his investigation and his report should only be relayed to Bard's Law Department or to those whom Bard's Law Department may direct." (*Id.* at 3 ¶ 9.) In his capacity as a consultant to Bard's Law Department during November and December 2004, "Dr. Lehmann communicated with a small and limited number of bard employees for the purpose of obtaining and providing information in order to fulfill his duties[.]" (*Id.* ¶ 10.) Dr. Lehmann submitted his final report to Ms. Passero on or about December 15, 2009. (*Id.* ¶ 11.) Ms. Passero, in turn, distributed the report to five Bard employees, with instructions that the report was to remain confidential and should only be distributed to those who needed the report to perform their job functions. (*Id.*)

Thus, Bard argues that while Dr. Lehmann admittedly served as a medical consultant to Bard in early 2004, Ms. Passero's affidavit is unequivocal that she subsequently hired Dr. Lehmann as part of the Law Department to provide consultative services to the Law Department. (Doc. # 63 at 9–10.) Bard therefore claims that the work he did was privileged, regardless of whether it was similar to work he performed prior to being retained in this capacity. (*Id.* at 9.) Bard also contends that because Dr. Lehmann's services were sought in anticipation of litigation, his work is also protected under the work product doctrine. (*Id.* at 9, relying on *Torf,* 357 F.3d at 907; *United States v. Kovel,* 296 F.2d 918, 922 (2d Cir.1961).)

Ms. Passero's affidavit contains similar representations with respect to the retention of Dr. Holcomb, who served as a consultant assisting Dr. Lehmann with certain aspects of his investigation and report. (*See* Doc. # 52–3 at 4–5 ¶¶ 13–18.)

While Plaintiff does not dispute Bard's contention that Dr. Lehmann and Dr. Hol-comb can be considered the "functional equivalent" of Bard employees under the *Graf* case, Plaintiff argues that Bard has not made a showing that the other consultants identified in Bard's privilege log (*e.g.,* Kimberly Ocampo, Lee Lynch, and John Kaufmann) were the "functional equivalent" of employees of Bard, and therefore, the privilege is waived for these communications. (Doc. # 64 at 16.) Plaintiff further asserts that Bard has not established that these consultants were hired to assist in the rendering of legal advice. (*Id.* at 16–17.)

With respect to each consultant, the court will have to make an individual determination as to whether the consultant can be considered a "representative of a client" under Nevada Revised Statute 49.075 (defining "representative of a client" as "a person having authority to obtain professional legal services, or to act on advice rendered pursuant thereto, on behalf of the client"). In conducting this analysis, in the absence of controlling state law on the issue, the court will turn to the Ninth Circuit's application of the "functional equivalent" of an employee theory in deciding whether specific communications are covered by the attorney-client privilege. *See Graf,* 610 F.3d at 1158–59 (adopting "functional equivalent" of employee principles as outlined in *In re Bieter Co.,* 16 F.3d 929 (8th Cir.1994)). In addition, where Bard asserts that a specific communication with a consultant is protected by the work product doctrine, the court will have to engage in an analysis of whether the consultants were retained to perform work in anticipation of litigation.

### (f) Communications with Outside Counsel

Bard claims that its employees' communications with outside counsel, including attorneys Richard North and Howard Holstein, are presumptively privileged. (Doc. # 52 at 15, relying on *United States v. Chen,* 99 F.3d 1495, 1501 (9th Cir.1996); *Ideal Elec. Co. v. Flowserve Corp.,* 230 F.R.D. 603, 607 (D.Nev. 2005).)

Plaintiff argues that there is no case in the Ninth Circuit or Nevada applying this presumption. (Doc. # 64 at 17.) Plaintiff fur-

ther asserts that the only Joint Selection document involving a communication to or from outside counsel is Joint Selection 1, which consists of meeting minutes created by Mr. Holstein regarding the Filter. (*Id.*) Plaintiff claims that these meeting minutes do not represent legal advice, but are merely a record of what was said by various persons at the meeting. (*Id.*)

■ Both *Chen* and *United States v. ChevronTexaco Corp.* affirm that "[c]ommunications between a client and its outside counsel are presumed to be made for the purpose of obtaining legal advice." *United States v. ChevronTexaco Corp.*, 241 F.Supp.2d at 1073 (citing *Chen*, 99 F.3d at 1501); *Chen*, 99 F.3d at 1501 (rebuttable presumption that lawyer is hired to give legal advice); *see also AT&T Corp. v. Microsoft Corp.*, No. 02–0164 MHP (JL), 2003 WL 21212614, at *4 (N.D.Cal. Apr. 18, 2003) (same). Due to the inherent nature of the attorney-client privilege, and in the absence of any persuasive argument that this presumption should not apply in Nevada, the court concludes that it should. However, the nature of the documents at issue in this case, *e.g.*, meeting minutes, may serve to rebut the presumption, but will have to be examined on a document-by-document basis.

## B. Work Product Doctrine

### 1. In General

The parties agree that federal law controls the determination of whether the work product doctrine protects documents withheld by Bard. (Doc. # 52 at 15; Doc. # 54 at 16–17.)

This doctrine, codified in Federal Rule of Civil Procedure 26(b)(3), protects "from discovery documents and tangible things prepared by a party or his representative in anticipation of litigation." Production of documents otherwise protected by the doctrine may only be ordered upon a showing of "substantial need" and "undue hardship" in obtaining "the substantial equivalent of the materials by other means." Fed.R.Civ.P. 26(b)(3). "The work product rule is not a privilege but a qualified immunity protecting from discovery documents and tangible things prepared by a party or his representative in anticipation of litigation." *Admiral*

*Ins. Co. v. United States Dist. Ct. for Dist. of Az.*, 881 F.2d 1486, 1494 (9th Cir.1989).

The work product doctrine also protects attorneys' thought processes and legal recommendations. *Hickman v. Taylor*, 329 U.S. 495, 510–11, 67 S.Ct. 385, 91 L.Ed. 451 (1947). To qualify for protection against discovery under the work product doctrine, the documents or information must: (1) "be 'prepared in anticipation of litigation or for trial,'" and (2) "be prepared 'by or for another party or by or for that other party's representative.'" *In re Grand Jury Subpoena (Mark Torf/Torf Envtl. Mgmt.)*, 357 F.3d 900, 907 (9th Cir.2004) (quoting *In re Cal. Pub. Utils. Comm'n*, 892 F.2d 778, 780–81 (9th Cir.1989)).

The work product doctrine "shields both opinion and factual work product from discovery." *Pacific Fisheries, Inc. v. United States*, 539 F.3d 1143, 1148 (9th Cir.2008). Opinion work product, an attorney's mental impressions, conclusions, opinions or legal theories, is only discoverable when counsel's mental impressions are at issue and there is a compelling need for disclosure. *Holmgren v. State Farm Mut. Auto. Ins. Co.*, 976 F.2d 573, 577 (9th Cir.1992). Other work product is discoverable only if the opposing party can demonstrate "substantial need" and that it is otherwise unable to obtain the substantial equivalent without "undue hardship." Fed. R.Civ.P. 26(b)(3).

As in the case of the attorney-client privilege, the party claiming the protection bears the burden of demonstrating the applicability of the work product doctrine. *See Tornay v. U.S.*, 840 F.2d 1424, 1426 (9th Cir.1988) (citing *U.S. v. Hirsch*, 803 F.2d 493, 496 (9th Cir.1986)); *see also Garcia v. City of El Centro*, 214 F.R.D. 587, 591 (S.D.Cal.2003).

### 2. Application to Consultants

As long as the documents were created in anticipation of litigation, the doctrine applies to investigators and consultants working for attorneys. *See Torf*, 357 F.3d at 907 (citing *United States v. Nobles*, 422 U.S. 225, 239, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975)).

At its core the work product doctrine shelters the mental processes of the attorney,

providing a privileged area within which he can analyze and prepare his client's case. But the doctrine is an intensely practical one, grounded in the realities of litigation in our adversary system. One of those realities is that attorneys often must rely on the assistance of investigators and other agents in the compilation of materials in preparation for trial. It is therefore necessary that the doctrine protect material prepared by agents for the attorney as well as those prepared by the attorney himself.

*Id.* (quoting *Nobles*, 422 U.S. at 238–39, 95 S.Ct. 2160).

### 3. Prepared In Anticipation of Litigation and Dual Purpose Documents

For the work product doctrine to apply, the documents or information must have been prepared in anticipation of litigation. Fed.R.Civ.P. 26(b)(3); *Hickman*, 329 U.S. at 510–11, 67 S.Ct. 385. Thus, the party asserting this protection must demonstrate the threat of litigation was impending. When this issue comes before the court it necessarily requires a case-by-case inquiry. *See Garcia v. City of El Centro*, 214 F.R.D. 587, 592 (S.D.Cal.2003) (citations omitted) (noting there is no Ninth Circuit authority outlining the criteria for determining whether document is prepared in anticipation of litigation, and stating that determination should therefore be made on a case-by-case basis; concluded under the facts presented that claims adjuster's interview was not conducted in anticipation of litigation).

Most courts which have confronted the issue conclude that some remote prospect of litigation is not sufficient. *See, e.g., United States v. Bergonzi*, 216 F.R.D. 487, 494–98 (N.D.Cal.2003) (concluding that investigation conducted by attorneys was in response to securities fraud suits being filed against company, therefore, the work product doctrine was implicated); *Miller v. Pancucci*, 141 F.R.D. 292 (C.D.Cal.1992) (concluding that police department documents prepared in ordinary course of internal affairs investigation in response to citizen complaint were not prepared in anticipation of specific litigation, so they were not entitled to work product protection); *see also Hertzberg v. Veneman*, 273 F.Supp.2d 67, 75 (D.D.C.2003) ("While litigation need not be imminent or certain in order to satisfy the anticipation-of-litigation prong of the test, this circuit has held that at the very least some articulable claim, likely to lead to litigation was fairly foreseeable at the time the materials were prepared."); *SmithKline Beecham Corp. v. Pentech Pharms., Inc.*, No. 00 C 2855, 2001 WL 1397876 (N.D.Ill. Nov. 6, 2001) ("[T]o be subject to work-product immunity, documents must have been created in response to 'a substantial and significant threat' of litigation, which can be shown by 'objective facts establishing an identifiable resolve to litigate.' Documents are not work-product simply because 'litigation [is] in the air' or there is a remote possibility of some future litigation."); *but see In re Sealed Case*, 146 F.3d 881, 887 (D.C.Cir.1998) (finding that work product "turns not on the presence or absence of a specific claim, but rather on whether, under 'all of the relevant circumstances,' the lawyer prepared the materials in anticipation of litigation.").

The Ninth Circuit has referred to documents prepared exclusively "in anticipation of litigation" as "single purpose" documents. *See Torf*, 357 F.3d at 907. There is no question such documents are protected by the work product doctrine. *Id.* (citation omitted). However, as in the application of the attorney-client privilege, "dual purpose" documents may also exist-documents which were prepared in anticipation of litigation and for another purpose. *Id.*

"In circumstances where a document serves a dual purpose, that is, where it was not prepared exclusively for litigation, then the 'because of' test is used." *United States v. Richey*, 632 F.3d 559, 567–68 (9th Cir.2011) (citing *Torf*, 357 F.3d at 907). Under this standard, "[d]ual purpose documents are deemed prepared *because of* litigation if 'in light of the nature of the document and the factual situation in the particular case, the document can be fairly said to have been prepared or obtained because of the prospect of litigation.'" *Id.* (emphasis added); *see also Torf*, 357 F.3d at 907 (stating the same) (quoting Charles Alan Wright, Arthur R. Miller, and Richard L. Marcus, *8 Federal*

*Practice & Procedure* § 2024 (2d ed. 1994)). In applying the "because of" standard, courts must again consider the totality of the circumstances and determine whether the "document was created because of anticipated litigation, and would not have been created in substantially similar form but for the prospect of litigation." *Richey,* 632 F.3d at 567–68; *see also Torf,* 357 F.3d at 908 (quoting *United States v. Adlman,* 134 F.3d 1194, 1195 (2d Cir.1998)). Under the "because of" standard, " 'the nature of the document *and* the factual situation of the particular case' are key to a determination of whether work product protection applies." *Torf,* 357 F.3d at 908 (emphasis original) (quoting *Wright & Miller* § 2024).

"When there is a true independent purpose for creating a document, work product protection is less likely, but when two purposes are profoundly interconnected, the analysis is more complicated." *Id.*

In *Torf,* the court pointed out that the company hired an attorney, who in turn hired a consultant, and was not "assigning an attorney a task that could just as well have been performed by a non-lawyer." *Id.* at 909. There, the attorney was hired only after the company learned it was under federal investigation, and the consultant assisted the lawyer in preparing the company's defense. *Id.* In addition, he also acted as an environmental consultant with respect to cleanup activities, i.e., a "dual purpose." *Id.* While the court acknowledged that with respect to the latter capacity, the company could have hired him directly, this did not prevent the company from applying the work product doctrine to documents produced in that capacity when they were "also produced 'because of' litigation." *Id.* Ultimately, the court held: "[t]he documents are entitled to work product protection because, taking into account the facts surrounding their creation, their litigation purpose so permeates any non-litigation purpose that the two purposes cannot be discretely separated from the factual nexus as a whole." *Id.* at 910.

As with its analysis of documents for which the attorney-client privilege is asserted, the court will have to ascertain the applicability and viability of the work product doctrine in connection with its *in camera* review of the corresponding documents.

## IV. PRELIMINARY DETERMINATIONS

### A. Privilege Log Requirements: Adequacy of Content and Information Provided by Bard's Privilege Logs

Plaintiff argues that Bard was tasked with demonstrating the elements of attorney-client privilege by submitting a compliant privilege log specifically identifying the subjects and categories outlined in *In re Grand Jury Investigation,* 974 F.2d at 1071 and *Dole v. Milonas,* 889 F.2d at 888 n. 3, 890. (Doc. # 54 at 10–11.) Plaintiff maintains that in order to meet this burden, Bard was also required to submit detailed affidavits sufficient to show that precise facts exist to support the claim, seemingly as to each document to which a claim of privilege or other protection is asserted. (*Id.* at 11, citing *Harvey's Wagon Wheel, Inc. v. N.L.R.B,* 550 F.2d 1139 (9th Cir.1976); *Nutmeg Ins. Co. v. Atwell, Vogel & Sterling,* 120 F.R.D. 504 (W.D.La.1988).)

Plaintiff claims that Bard's privilege logs have failed to provide this basic information. For example, Plaintiff argues: (1) Joint Selection 13 does not indicate who drafted the document and who received it; (2) Joint Selection 15 fails to identify the author or recipients; (3) Joint Selection 47 and 48 improperly include a large number of documents within a single entry, and fail to indicate who authored or received them and on what date they were created; (4) Joint Selection 49 does not indicate the date it was created, the author or recipients; and (5) Joint Selection 50 improperly includes a large number of documents, fails to indicate the author or recipients, or the date it was created. (Doc. # 54 at 11–12.) In addition, Plaintiff asserts that Bard has generally failed to provide adequate descriptions of documents and the persons involved. (*Id.* at 12–13.) Plaintiff also argues that the privilege logs fail to identify the specific discovery requests to which the privilege claim applies, which they claim is required by Rule 26(b)(5), as well as the

holding in *Burlington Northern & Santa Fe Ry. Co. v. U.S. D. Ct. for the D. of Mont.*, 408 F.3d 1142, 1149, 1149–50, (9th Cir.2005), a subject addressed in greater detail below.

Conversely, Bard asserts that its privilege logs do comply with the Federal Rules of Civil Procedure. Specifically, Bard argues that under Rule 26(b)(5) and the Advisory Committee comments, it is only required to "describe the nature of the documents, communications, or tangible things not produced or disclosed—and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim." (Doc. # 52 at 4.) Bard argues that while the Ninth Circuit has enumerated a list of factors regarding a privilege log that are generally considered sufficient to meet this burden (*id.* at n. 5), these factors are not to be viewed in a vacuum and the privilege log should not be approached with inflexible rigidity, especially where the case involves a large document production.

To that end, Bard states that it is permitted to submit affidavits to provide information and answer questions left open by the privilege log. (*Id.* at 4–7.) Bard further points out that the Advisory Committee notes state that "[d]etails concerning time, person, general subject matter, etc., may be appropriate if only a few items are withheld, but may be unduly burdensome when voluminous documents are claimed to be privileged or protected, particularly if the items can be described by categories." (*Id.* at 5.) Bard goes on to explain that to the extent it could not provide information in its privilege log, in view of the sheer volume of the document production, it was because the information did not exist or it would have been unduly burdensome or simply not feasible to provide such information. (*Id.* at 6.)

Although the law of the forum state controls the application of the attorney-client privilege, Federal Rule of Civil Procedure 26(b)(5) provides procedural guidance as to what must be included in a privilege log when a case is in federal court and a party withholds information on the basis that it is privileged or is protected by the work product doctrine. Rule 26(b)(5) requires that a party expressly claim a privilege and describe the nature of the documents, communications or things not produced so as to enable the other parties to assess the applicability of the privilege or protection. Incidentally, Nevada Rule of Civil Procedure 26(b)(5) contains a nearly identical provision.

While Plaintiff appears to claim that Bard was obligated to produce supporting affidavits in conjunction with its privilege log (Doc. # 54 at 11), this does not seem to be a requirement in this circuit. In fact, it does not appear the Ninth Circuit has weighed in on this issue. The Ninth Circuit case cited by Plaintiff, *Harvey's Wagon Wheel, Inc. v. N.L.R.B*, 550 F.2d 1139 (9th Cir.1976), involved a FOIA request and not a request for production of documents governed by Rule 26. *Id.* at 1141. In addition, the requirement to provide affidavits (or oral testimony) when a document is not disclosed pursuant to a FOIA request was grounded in Supreme Court precedent. *Id.* at 1141–42. On the other hand, the Southern District of New York has held that when a privilege log has been served, the obligation to produce affidavits to support its assertion of privilege should be limited to the elements of the privilege that are challenged by the withholding party's opponent. *See SEC v. Beacon Hill Asset Mgmt. LLC*, 231 F.R.D. 134 (S.D.N.Y.2004). This does not mean, however, that for those entries that are challenged by Plaintiff, Bard does not have to make a showing to establish the element of the privilege/work product protection claimed that Plaintiff asserts to be lacking, which may require an affidavit. But the court does not interpret this as requiring Bard to, in advance, produce an affidavit addressing *each* document for which privilege or work product is asserted.

The court agrees with Bard that not every case requires strict adherence to the list of items that should be part of a privilege log as identified in *In re Grand Jury Investigation*, 974 F.2d at 1071, and *Dole v. Milonas*, 889 F.2d at 888 n. 3, 890. This conclusion is supported the Advisory Committee's note on Rule 26(b)(5) which states:

The rule does not attempt to define for each case what information must be provided when a party asserts a claim of

privilege or work product protection. Details concerning time, persons, general subject matter, etc., may be appropriate if only a few items are withheld, but may be unduly burdensome when voluminous documents are claimed to be privileged or protected, particularly if the items can be described by categories.

As one popular practice guide observed, "the Advisory Committee foresaw that individual circumstances called for different reactions." (8 Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, Richard L. Marcus, *Federal Practice and Procedure* § 2016.1 (3d ed. 2012).)

Other district courts in this circuit have adopted this view. For example, *In re Imperial Corp. of America*, 174 F.R.D. 475 (S.D.Cal.1997), involved the productions of hundreds of thousands, if not millions of documents, and the court found the creation of a privilege log containing a document by document listing would be overly burdensome and was not required by Rule 26(b)(5).

In this case, where the volume of documents is unquestionably large, the court concludes Bard's privilege logs, which identify much of the information outlined in *In re Grand Jury Investigation* and *Dole v. Milonas,* satisfy the requirements of Federal Rule of Civil Procedure 26(b)(5).

## B. Waiver

### 1. Procedural Waiver

█ Plaintiff argues that the perceived deficiencies with respect to the privilege log operate as a waiver of the attorney-client privilege and work product assertions. (Doc. # 64 at 3:22–25, 4–5:1–19.)

The Advisory Committee notes to Rule 26(b)(5) make clear that the withholding otherwise discoverable materials on the basis that they are privileged or subject to the work product doctrine without notifying the other parties as provided in Rule 26(b)(5)(A) by describing the nature of the information so as to enable them to assess the claim, "*may* be viewed as a waiver of the privilege or protection." Fed. R. Civ. Pro. 26(b)(5) Advisory Committee's comment (emphasis added).

In the Ninth Circuit, in determining waiver has occurred, the court must look at: (1) "the degree to which the objection or assertion of privilege enables the litigant seeking discovery and the court to evaluate whether each of the withheld documents is privileged;" (2) "the timeliness of the objection and accompanying information about the withheld documents;" (3) "the magnitude of the document production;" and (4) "other particular circumstances of the litigation that make responding to discovery unusually easy ... or unusually hard." *Burlington Northern & Santa Fe Ry. Co. v. U.S. Dist. Ct. for the Dist. of Mont.,* 408 F.3d 1142, 1149 (9th Cir.2005). In evaluating these factors, the court is directed to apply them "in the context of a *holistic reasonableness analysis*" and not in a "mechanistic determination of whether the information is provided in a particular format." *Id.* (emphasis added).

Turning to these factors, the court finds that, by and large, Bard's privilege logs, coupled with the briefing and evidence provided by Bard, broadly enable Plaintiff and the court to evaluate whether the documents are privileged or protected by the work product doctrine. It is difficult to say what additional information Bard could provide without necessarily revealing the purported privileged portion of a document. While Plaintiff argues that it has taken months of prodding to get this far, the court does not perceive that Bard has necessarily been unreasonable or dilatory. Bard has undertaken a protracted review of an exceedingly large number of documents and has seemingly attempted to address the deficiencies asserted by Plaintiff by providing supplemental privilege logs. No one can dispute the magnitude of the document production in this case, which is evidenced by the amount of time the Plaintiff, Bard, and the court have spent discussing these matters. Compliance with ESI requests and the volume of the document production, among other things, have no doubt made responding to discovery unusually hard. Based on the court's experience with this litigation to date, there is and has been nothing "unusually easy" about discovery in this case.

Therefore, applying these factors in "the context of holistic reasonableness," *Burlington,* 408 F.3d at 1149, the court cannot conclude that Bard's privilege logs operate as a waiver of the attorney-client privilege or work product doctrine. What Plaintiff asks the court to order would amount to the "mechanistic determination of whether the information is provided in a particular format" which the Ninth Circuit cautioned against. *Id.*

Additionally, the court does not deem it prudent or a good utilization of the parties' or the court's time to order that Bard provide yet another supplemental privilege log. If there are instances where the court believes the privilege log is materially lacking, the court will order that Bard supplement that particular entry. However, with respect to many of the deficiencies outlined by Plaintiff, Bard has attempted to explain why this information was not provided. In the court's view, the information that was not provided can be supplanted by proper evidence where Plaintiff has attacked an element of the attorney-client privilege or work product doctrine. Plaintiff is not without a remedy because in the event the court finds Bard cannot supply sufficient evidence to support its privilege claim, the documents will be ordered to be produced. In that regard, the court will be undertaking an *in camera* review of the forty-three Joint Selection documents, the outcome of which will provide direction and further guidance to the parties as to how the court evaluates the attorney-client privilege and work product doctrine assertions. The court's analysis with respect to the forty-three Joint Selection documents can then be applied to remaining analogous categories of documents to which Bard has asserted the attorney-client privilege or work product protection.

In sum, the court finds, "in the context of holistic reasonableness," Bard's privilege logs are satisfactory such that they do not result in a waiver of its assertion of the attorney-client privilege and work product doctrine.

### 2. Implied "At–Issue" Waiver

█ Plaintiff also argues that the attorney-client privilege and work product doc-trine may be waived if the otherwise protected information is placed "at-issue" in the case. (Doc. # 54 at 17:15–17, Doc. # 64 at 20:10–15, both citing *Rhone–Poulenc Rorer v. Home Indem. Co.,* 32 F.3d 851, 863 (3d Cir.1994); *In re Human Tissue Prods. Liab. Litig.,* 255 F.R.D. 151, 158–161 (D.N.J.2008); *see also* Doc. # 54 at 18:21–22 (asserting that work product is not protected where it was impliedly waived); Doc. # 64 at 18, citing *Wardleigh v. Second Jud. Dist. Ct.,* 111 Nev. 345, 355, 891 P.2d 1180 (1995).) Plaintiff asserts that in asserting its affirmative defenses (including that the Recovery Filter was not defectively designed, that it did provide adequate warnings regarding known risks, and that it was not negligent), Bard will necessarily have to rely on documents which reveal their investigations into device failures and corrective action taken, documents analyzing and comparing failure rates, as well as other marketing, scientific and regulatory materials. (Doc. # 64 at 18.) Plaintiff therefore reasons that to the extent Bard has asserted claims of privilege or work product protection as to these documents, such claims are waived because Bard has put them "at-issue." (*Id.*)

It is true the "at-issue" waiver theory has been recognized by the Nevada Supreme Court. *See Wardleigh v. Second Jud. Dist. Ct.,* 891 P.2d at 1186 (citing *Developments in the Law–Privileged Communications,* 98 Harv. L.Rev. 1450, 1637 (1985)) ("It has become a well-accepted component of waiver doctrine that a party waives his privilege if he affirmatively pleads a claim or defense that places at-issue the subject matter of privileged material over which he has control."). The Nevada Supreme Court explained: "The doctrine of waiver by implication reflects the position that the attorney-client privilege was intended as a shield, not a sword." *Id.* (internal quotation marks and citations omitted). "[A]t-issue waiver occurs when the holder of the privilege pleads a claim or defense in such a way that eventually he or she will be forced to draw upon the privileged communication at trial in order to prevail, and such a waiver does not violate the policies underlying the privilege." *Id.*

[P]lacing-at-issue waiver can be justified as an application of the 'anticipatory waiver' principle: an allegation, like a pre-trial disclosure, merely anticipates a waiver that will occur at trial. When the party asserting the privilege bears the burden of proof on an issue and can meet that burden only by introducing evidence of a privileged nature, waiver is clearly warranted ... [b]ut when the burden of proof does not lie with the party asserting the privilege, waiver is warranted only once a party indicates an intention of relying upon privileged evidence during trial. This analysis provides a simple rule of thumb for determining whether an allegation creates unfairness that calls for waiver.

*Id.* (citing *Developments in the Law—Privileged Communications,* 98 Harv. L.Rev. 1450, 1639 (1985)) (internal quotation marks omitted).

The Ninth Circuit has also applied the "at-issue" waiver theory:

The doctrine of waiver of the attorney-client privilege is rooted in notions of fundamental fairness. Its principal purpose is to protect against the unfairness that would result from a privilege holder selectively disclosing privileged communications to an adversary, revealing those that support the cause while claiming the shelter of the privilege to avoid disclosing those that are less favorable ... For this reason we have admonished that the focal point of privilege waiver analysis should be the holder's disclosure of privileged communications to someone outside the attorney-client relationship, not the holder's intent to waive the privilege[.]

*Tennenbaum v. Deloitte & Touche,* 77 F.3d 337, 340–41 (9th Cir.1996).

The "at-issue" waiver has also been discussed in the work product context. *See, e.g., Walker v. County of Contra Costa,* 227 F.R.D. 529, 533 (N.D.Cal.2005) ("Several cases have held that defendants also lose the work product and attorney-client privileges once they assert the investigation as an affirmative defense."). Because the theory of implied waiver for placing information "at-issue" is the same in the work product context, the court's conclusion on this issue applies equally to Plaintiff's waiver argument as to work product.

The court acknowledges the validity of the "at-issue" waiver argument advanced by Plaintiff, but it is not so clear that it is applicable at this juncture. Plaintiff is asking the court to make a leap between the assertion of broad affirmative defenses by Bard and various documents that Plaintiff speculates Bard will rely on in proving these defenses. The court would agree, in theory, that Bard cannot assert these defenses and then withhold from production the very documents that support them. This would be a classic instance of using the privilege as a sword and shield. However, it is not readily apparent at this point in time that Bard will be relying on any specific documents it has withheld to support its defenses.

In other words, the court cannot conclude at this point that Bard has affirmatively put these documents "at-issue." The court recognizes Plaintiff will likely take the position that a delay in resolution of this issue will prejudice him in preparing his case. However, Plaintiff is not without a remedy. If at some later time it becomes clear that Bard intends to rely on specific documents (such as documents detailing an investigation and corrective action) to support its defenses (*e.g.,* that it investigated incidents of failure and took corrective action), Plaintiff may raise the issue again and at that juncture either seek production or exclusion of the documents, and such a motion will likely be well received by the court.

Conversely, if Bard determines that it wants to retain the right to offer these documents as evidence in support of its defenses, it must abandon the attorney-client privilege or work product doctrine and produce the documents to Plaintiff and allow him to inquire into them as he would otherwise be permitted if they were produced in the course of discovery.

The court's pretrial order procedures also serve to protect Plaintiff in this regard. When it comes time for the parties to file their joint pretrial order in this case, they will each have to identify all exhibits which they intend to offer at trial in support of

their case. *See* Local Rule 16–3(c)(8). It is unlikely the court will allow Bard to offer an exhibit at trial that has not been produced to Plaintiff in discovery, as part of its initial disclosures or otherwise.

Alternatively, should Bard seek to rely on documents it has withheld from Plaintiff in connection with a motion for summary judgment, Plaintiff may seek appropriate relief under Federal Rule of Civil Procedure 56(d).

In sum, the court declines to enter a blanket ruling at this time that Bard has waived the assertion of the attorney-client privilege or work product doctrine as to a broad category of documents by placing them "at issue." If, in the process of conducting its *in camera* review, the court is confronted with a particular document it determines that Bard will no doubt have to rely on in order to support its asserted affirmative defenses, the court will address the waiver issue with respect to that specific document, on a case-by-case basis.

### C. Correlation of the Allegedly Privileged or Protected Document to the Corresponding Discovery Request

The court will next address Plaintiff's claim that the privilege logs are deficient because they fail to indicate to which discovery request the privilege or work product claim applies. Plaintiff asserts this is required by Rule 26(b)(5) and *Burlington*, 408 F.3d at 1149–50. (Doc. # 54 at 13.)

■ Pursuant to Rule 26(b)(5), a party withholding information on the grounds that it is privileged or subject to the work product doctrine must expressly claim it as such and describe the nature of the information to enable the other party to assess the claim. The rule does not require, at least specifically, the correlation of the specific discovery requests and the privilege claim.

Despite Plaintiff's argument to the contrary, *Burlington* also did not adopt correlation as a requirement; it merely observed that the district court had stated that the privilege logs failed to correlate specified documents with specific discovery requests. The Ninth Circuit somewhat caustically commented that it was "not in a position . . . to

definitively resolve the reciprocal claims of gamesmanship advanced by both parties[.]" *Burlington*, 408 F.3d at 1150. It seemed to imply that this is one facet that the district court could evaluate in making a waiver determination under the other factors evaluated in *Burlington*. *Id.* Thus, *Burlington* did *not* make a finding that privilege logs must correlate specific documents to specific discovery requests. Given the magnitude of documents produced in this case, the court is not inclined to require such correlation at this point.

### D. Privilege Log Details for Multiple E-mails Within One Document

■ Finally, before turning to a discussion of the application of the attorney-client privilege and work product doctrine to the Joint Selection documents, the court will address Plaintiff's claim that Bard must provide separate entries or explanations for *each* e-mail within an e-mail chain and for each attachment to an e-mail (assuming the e-mail or "parent e-mail" is privileged). (See Doc. # 54 at 14, requesting an order that Bard list each document, e-mail and attachment as separate entries.)

Bard argues that this level of detail is not required under the law. (*See* Doc. # 63 at 5–6.) It asserts that all e-mails within an e-mail chain are considered one communication. (*Id.*, citing *United States v. ChevronTexaco Corp.*, 241 F.Supp.2d at 1075 n. 6; *Dawe v. Corrections USA*, 263 F.R.D. 613, 621 (E.D.Cal.2009); *Muro v. Target Corp.*, 250 F.R.D. 350, 362–63 (N.D.Ill.2007).)

*ChevronTexaco* does not state that all e-mails within a chain are considered one communication. Instead, the court stated:

> Chevron's assertion that each separate e-mail stands as an independent communication is inaccurate. What is communicated with each e-mail is the text of the e-mail and all the e-mails forwarded along with it. If an e-mail with otherwise privileged attachments is sent to a third party, Chevron loses the privilege with respect to that e-mail *and all of the attached e-mails*.

*ChevronTexaco*, 241 F.Supp.2d at 1074 n. 6 (emphasis original).

In *Muro,* the court evaluated, among other things, the magistrate judge's finding that a privilege log failed to separately identify and give a description for each message within an e-mail chain that was claimed to be privileged. *Muro,* 250 F.R.D. at 362. The magistrate judge came to this conclusion because he determined the failure to separately itemize each e-mail flouted Rule 26(b)(5)'s requirement to give the opposing party enough information to assess the privilege claim. *Id.* *Muro* pointed out that there is a split of authority with respect to whether a privilege log should separately itemize e-mails contained within an e-mail chain. *Id.* It pointed out that in *ChevronTexaco,* the court found that one e-mail chain should receive a single entry. *Id.* (citing *ChevronTexaco,* 241 F.Supp.2d at 1074 n. 6). On the other hand, it also pointed out that some courts have required separate itemization, "to enable the opposing party to determine whether each e-mail in the strand is entitled to privilege, on the theory that this inquiry is necessary if the court is to determine that the entire strand is to receive protection." *Id.* at 362–63 (citing *In re Univ. Serv. Fund Tel. Billing Practices Litig.,* 232 F.R.D. 669, 673 (D.Kan. 2005); *Stafford Trading, Inc. v. Lovely,* No. 05 C 4868, 2007 WL 611252, at *8 (N.D.Ill. Feb. 22, 2007)).

Ultimately, *Muro* concluded that Rule 26(b)(5) did not require separate itemization. *Id.* at 363. Relying on *Upjohn,* it reasoned that non-privileged information communicated to an attorney may be privileged "even if the underlying information remains unprotected." *Id.* (citing *Upjohn,* 449 U.S. at 395–96, 101 S.Ct. 677). Therefore, it concluded: "even though one e-mail is not privileged, a second e-mail which forwards that prior e-mail to counsel might be privileged in its entirety." *Id.* It analogized this to the situation where "prior conversations or documents" are "quoted verbatim in a letter to a party's attorney." *Id.* As a result of this conclusion, the court keenly noted that "[a] party can therefore legitimately withhold an entire e-mail forwarding prior materials to counsel, while also disclosing those prior materials themselves." *Id.*

*Dawe* initially reiterates the point made in *ChevronTexaco* that an e-mail consists of the sender's message as well as the prior e-mails that are attached. *Dawe,* 263 F.R.D. at 621. Next, the court cited to *Muro* for the proposition that a privilege log does not require the separate itemization of e-mails, and that while one e-mail may not be privileged and discoverable on its own, a second e-mail which forwards the prior non-privileged e-mail to counsel may be entirely privileged. *Id.* The court then applied these guidelines to privilege log entries in the case before it.

After reviewing the authorities above, the court is not inclined at this juncture to order the reproduction of all of the e-mails in this document production in separate format or to require separate itemization in the privilege log. This conclusion is in accord with the court's finding in *Dawe* that Rule 26(b)(5)(A) does not require separate itemization of e-mails in a privilege log. *Dawe,* 263 F.R.D. at 621. However, this does not mean the e-mails that were part of an e-mail chain that are not privileged in and of themselves should not have been produced if they existed separately assuming they are otherwise relevant and responsive.

## V. REVIEW OF THE JOINT SELECTION DOCUMENTS

Having now discussed what the court finds to be the law relevant to the attorney-client and work product disputes, the court will undertake a review of the forty-three Joint Selection documents submitted to the court for *in camera* review. The court has identified each of the forty-three Joint Selection documents below, providing a description of the document and corresponding privilege or protection asserted, that was obtained from Plaintiff's filing. (*See* Doc. # 60.)

Finally, while acknowledging the difficulty of this task, in discussing the applicability of the asserted privilege or protection with respect to each Joint Selection, the court has endeavored to maintain the asserted confidentiality of the documents.

| No. | Description | Privilege/Protection Asserted |
|-----|-------------|-------------------------------|
| 1 | Memo from outside counsel providing meeting minutes on Recovery® Filter. | Attorney–Client Privilege |

This document is described as a memorandum dated February 10, 2004, from outside counsel, Howard Holstein to Mary Edwards, Vice President, Regular & Clinical Affairs, providing meeting minutes on the Recovery Filter.

The participants in the actual meeting appear to have included various persons affiliated with the FDA, and the minutes summarize topics raised by the FDA regarding the Recovery Filter.

While there is a presumption that communications between a client and outside counsel are made for the purpose of obtaining legal advice, this presumption is rebuttable. *See Chen,* 99 F.3d at 1501, *United States v. ChevronTexaco Corp.,* 241 F.Supp.2d at 1073. Nevada law protects the disclosure of confidential communications made for the purpose of facilitating the rendition of legal services. Nev.Rev.Stat. 49.095. A communication is confidential if "it is not intended to be disclosed to third persons" unless it is in "furtherance of the rendition of professional legal services." Nev.Rev.Stat. 49.055.

■ Here, it does not appear that these meeting minutes were sent to Ms. Edwards for the purpose of rendering legal advice. While Bard argues that Mr. Holstein was retained to provide legal advice regarding the submission of the Recovery Filter to the FDA (Doc. # 52 at 23–24), there is nothing in these meeting minutes that indicates the provision of legal advice. Rather, this appears, at best, to have been a ministerial task of forwarding notes that were taken of the meeting.

This document was not claimed to come within the work product doctrine. Nevertheless, the court notes there is no indication that it was prepared in anticipation of litigation.

Therefore, the court orders that Joint Selection 1 be produced to Plaintiff.

| No. | Description | Privilege/Protection Asserted |
|-----|-------------|-------------------------------|
| 3 | Attachment transmitted from client to client and independent consultant that is the subject of a request for legal advice regarding an adverse event. | Attorney-Client Privilege |

■ This document dated February 17, 2004, is described as an e-mail reflecting communication to outside counsel, Howard Holstein, for the purposes of obtaining legal advice concerning a patient complication and provided to employees who needed the information to perform their job functions.

The document is actually an e-mail from Chris Ganser (Vice President Quality, Environmental Services and Safety) to Dr. Lehmann, forwarding an e-mail of the same date that Mr. Ganser sent to Howard Holstein (outside counsel), copying Brian Barry and Tim Ring.

After reviewing the document, the court has determined that the initial e-mail was sent to outside counsel for purposes of obtaining legal advice. The fact that it was forwarded on to Dr. Lehmann, Bard's consultant at the time, does not defeat the privilege. Plaintiff has conceded that Dr. Lehmann was considered the "functional equivalent" of a Bard employee. (*See also, United States v. Graf,* 610 F.3d at 1158–59; Nev.Rev.Stat. 49.075 (defining client representative).) In addition, Bard represents that the other non-lawyer employees who were copied on the initial e-mail were given this information in order to perform their jobs. Bard has supplied the affidavit of Donna L. Passero, Esq., which indicates that Bard has a policy that communications between and among Bard employees and counsel, made for the purposes of giving or receiving legal advice and those created in anticipation of litigation are kept confidential.

Therefore, Joint Selection 3 need not be produced to Plaintiff.

| No. | Description | Privilege/Protection Asserted |
|---|---|---|
| 5 | Portion of email requesting and reflecting legal advice of Donna Passero, Esq., and Howard Holstein, Esq., regarding sales communications provided to employees who need the information to perform their job functions | Attorney-Client Privilege |

■ This document is described by Bard as a March 16, 2004 e-mail from Mary Edwards (Vice President, Regulatory & Clinical Affairs) to Paul Kowalczyk (Corporate Staff VP RA Operations & Promotion), Doug Uelmen (Vice President, Quality Assurance), Janet Hudnall (Marketing Manager, Filters), Joe DeJohn (Vice President, Sales), Len DeCant (Vice President, Research & Development), Robert Carr (R & D Program Director Inv), and John McDermott (President, BPV), copying Donna Passero (Assistant General Counsel), Howard Holstein (attorney), Christopher Ganser (Vice President, Quality, Environmental Services and Safety), and John Lehmann (consultant).

Joint Selection 5 is actually a chain of e-mails, none of which appears to be requesting or rendering legal advice. Instead, one of the e-mails merely references a "proposed sales communiqué" and indicates a comment by in-house and outside counsel regarding whether or not to utilize a photo. The "primary purpose" of the communication is a business determination with no apparent legal implication.

Therefore, Bard is ordered to produce Joint Selection 5 to Plaintiff, unredacted.

| No. | Description | Privilege/Protection Asserted |
|---|---|---|
| 6 | Email and attachments reflecting communication with Bard counsel Donna Passero, for purposes of obtaining legal advice about communication plan and supporting documents. | Attorney-Client Privilege; Work Product |

■ This document is described by Bard as an April 13, 2004 e-mail from Lee Lynch (consultant) to Holly Glass (Vice President, Government & Public Relations), Janet Hudnall (Marketing Manager–Filters), John Lehmann (consultant), Kellee Jones (Executive Administrative Assistant), and Donna Passero (Assistant General Counsel), copying Kimberly Ocampo (consultant). It is claimed to be protected under the attorney-client privilege and work product doctrine. Bard asserts that it is an e-mail and attachments reflecting communication with Bard's counsel, Donna Passero, for the purpose of obtaining legal advice about a communication plan and supporting documents.

Bard indicates that this e-mail includes draft revisions of a Recovery Filter communications plan, and while the final version of the plan has been produced, the drafts with attorney revisions are being withheld as privileged. (Doc. # 52 at 23, n. 14.) Bard further asserts that there was no waiver of the privilege as a result of the inclusion of Dr. Lehmann or the Hill and Knowlton employees because they were "functional equivalent" of Bard employees.

The e-mail asks for a review of the documents and for a follow-up call to go through the revisions. It also states that questions for consideration and feedback are highlighted in yellow within the documents and includes additional direct questions for certain individuals including for Kellee Jones and Janet Hudnall. None of the highlighted portions of the draft plan are directed to counsel, Donna Passero. Nor are any of the questions directed to her attention, or to the attention of any other attorney.

The document that follows is a memorandum from Lee Lynch at Hill & Knowlton to Holly Glass regarding the communications plan which states that it provides a guide for implementing an "immediate *communications strategy* to ensure C.R. Bard is pre-

pared for any *news* coverage...." (emphasis added). Legal counsel is not included as a recipient. The document states that the plan is "intended to prepare for general or national coverage that may result from a lawsuit being filed, product withdrawal and or general negative stories surrounding Recover Vena Cava Filters." It does state that "H & K has begun monitoring for any coverage surrounding a potential lawsuit."

However, the court cannot conclude that the "primary purpose" of this document was to obtain legal advice. While Bard states in its brief that the document contains the comments or revisions from Donna Passero, this is not evident from the documents themselves. Rather, there appear to be questions posed to other non-legal employees of Bard, and there is no indication that any comments or revisions were from Donna Passero. While Bard has provided an affidavit from Donna Passero, it does not contain any reference to this document.

With respect to the work product doctrine, Bard claims that this document was created in response to the first patient death associated with the Recovery Filter "in anticipation of media coverage, and, potentially, litiga-tion." (Doc. # 52 at 23.) Given that this followed the first death as a result of alleged migration of a filter, it is plausible that this was created in anticipation of potential litigation, along with being created in anticipation of media coverage about the event. Since there is a mixed purpose, Bard must show "in light of the nature of the document and factual situation in the particular case, the document can be fairly said to have been prepared or obtained because of the prospect of litigation." *Richey*, 632 F.3d 559, 567–68; *Torf*, 357 F.3d at 907. Courts should inquire as to whether the document "would not have been created in substantially similar form but for the prospect of litigation." *Richey*, 632 F.3d at 567–68; *Torf*, 357 F.3d at 908.

This document was created by what appears to be a public relations firm, and while the prospect of litigation is mentioned, it clearly revolves around how Bard should address media coverage of this event. The court simply cannot conclude that this document was prepared "because of" the prospect of litigation.

The court therefore concludes that this document should be produced to Plaintiff.

| No. | Description | Privilege/Protection Asserted |
|---|---|---|
| 7 | Memo created at direction of counsel, Donna Passero, Esq., concerning litigation claimant and created in anticipation of furtherance of litigation. | Attorney-Client Privilege; Work product |

Bard describes Joint Selection 7 as a memorandum dated April 17, 2004, from Dr. Lehmann (consultant) to Donna Passero (Assistant General Counsel), at the direction of Donna Passero, concerning a litigation claimant, in anticipation and furtherance of litigation. Bard claims it is protected by the attorney-client privilege and work product doctrine.

As indicated above, Bard has submitted the affidavit of Ms. Passero, stating that she, along with Bard's Law Department, retained Dr. Lehmann in early November of 2004, "for the purpose of providing outside consul-tation services to the Law Department regarding anticipated and ongoing product liability litigation." (Doc. # 52–3 at 2 ¶ 6.)

After reviewing the document, the court finds that Joint Selection 7 does indeed indicate that it was prepared at the direction of Ms. Passero. The document also references a deposition which militates in favor of a finding that the document was prepared by Dr. Lehmann in anticipation or because of litigation.

Therefore, the court finds Joint Selection 7 is protected work product.

| No. | Description | Privilege/Protection Asserted |
|---|---|---|
| 8 | Email providing information for purpose of obtaining legal advice from Donna Passero, Esq., concerning action plan and provided to employees who need the information to perform their job function | Attorney-Client Privilege |

■ Joint Selection 8 is described as an e-mail dated May 3, 2004, from Dr. Lehmann to Donna Passero copying Brian Barry (Vice President, Corporate RA/CA), Paul Kowalczyk (Corporate Staff Vice President, RA Operations & Promotion), Chris Ganser (Vice President, Quality, Environmental Services and Safety), Mary Edwards (Vice President, Regulatory & Clinical Affairs), and Doug Uelmen (Vice President, Quality Assurance). Bard indicates that the non-legal employees were copied because they needed the information to perform their job function. Bard claims this communications comes within the attorney-client privilege. Bard argues that this e-mail provided "information and analysis to counsel so that counsel can provide legal advice to the corporation concerning what actions, if any, to take." (Doc. # 52 at 25.) In addition, Bard asserts that "[g]iven the complex regulatory and legal issues involved, Ms. Passero, Esquire's involvement was necessary so that she could counsel the corporation on the legal ramifications of any potential action." (Id.)

This document consists of Dr. Lehmann's comments following review of a proposed action plan. Presumably this is the action plan referenced in Joint Selection 6. It is not clear from the face of this document that the primary purpose of the communication was to facilitate the rendering of legal advice. The e-mail references differences in data for quantitative event comparisons to be provided in the action plan. It also discusses communications with other non-legal employees of Bard concerning the data, which tends to indicate it was not in the realm of facilitating the rendering of legal advice. Bard did not provide any supplementary evidence such as a declaration to further explain the nature of this communication. As a result, the court finds Bard has not met its burden of establishing each element of the attorney-client privilege.

Therefore, Joint Selection 8 shall be produced to Plaintiff.

| No. | Description | Privilege/Protection Asserted |
| --- | --- | --- |
| 9 | Portion of email reflecting legal advice of Donna Passero, Esq., concerning potential consultant and provided to employees who need the information to perform their job functions. | Attorney-Client Privilege |

■ This document is a portion of a May 5, 2004 e-mail from Janet Hudnall (Marketing Manager–Filters) to Hill & Knowlton, Holly Glass (Vice President, Government & Public Relations), John McDermott (President, BPV), Chris Ganser (Vice President, Quality, Environmental Services & Safety), Dr. Lehmann (consultant), Donna Passero (Assistant General Counsel), and Rob Carr (R & D Program Director). Bard asserts that it reflects the legal advice of Donna Passero concerning potential consultant and was provided to employees who needed the information to perform their jobs. (See also Doc. # 52 at 25.) Bard concedes that the "facts" underlying this communication are not privileged, but argues the communication itself is privileged. (Id.)

This email also relates to the communications plan and the request for Bard employees to review and comment on drafts of that document. Above, the court that the primary purpose of the communications plan was to render legal advice. Similarly, this e-mail does not reflect legal advice of Donna Passero, as Bard suggests. Rather, it simply refers to a comment Ms. Passero made regarding the contents of this communications plan which does not appear to have legal significance. As a result, the court cannot find that it comes within the attorney-client privilege.

Therefore, Joint Selection 9 should be produced in its unredacted form to Plaintiff.

| No. | Description | Privilege/Protection Asserted |
| --- | --- | --- |
| 10 | Email and attachments regarding legal advice about Crisis Plan. | Attorney–Client Privilege |

■ This document consists of an e-mail

and attachments dated May 10, 2004 from Kimberly Ocampo (consultant) to Brian Barry (Vice President, Corporate RA/CA) and copying Christopher Ganser (Vice President, Quality, Environmental Services and Safety), Holly Glass (Vice President, Government & Public Relations), Janet Hudnall (Marketing Manager–Filters), John Lehmann (consultant), Lee Lynch (consultant), John McDermott (President, BPV), Donna Passero (Assistant General Counsel), and Doug Uelmen (Vice President, Quality Assurance).

Again, Bard asserts that this document relates to draft versions of a Recovery Filter communications plan created in response to the first patient death associated with the Recovery Filter in anticipation of media coverage, and potentially litigation. (Doc. # 52 at 23.) This message was sent and directed to the attention of Brian Barry, a corporate vice president, and merely copied to other Bard employees and consultants as well as in-house counsel Donna Passero. The e-mail asks Mr. Barry to review and comment upon the draft plan which Bard asserts also includes comments on behalf of Dr. Lehmann, Donna Passero, Janet Hudnall, John McDer-

mott, Chris Ganser, Doug Uelmen, and Holly Glass.

The first attachment is a draft of an "external Q & A" regarding the Recovery Filter. It does not appear to contain any comments of counsel that might be considered privileged. The next attachment is a memorandum from Hill & Knowlton which encloses a draft of the guide for implementing a "communications strategy" to ensure Bard is "prepared for any news coverage that may result from pending investigations surrounding the Recovery Vena Cava Filter." None of the highlighted comments reflect any legal advice. Rather, they appear to be notes to include additional information without legal significance. The last attachment is an "internal Q & A" regarding the Recovery Filter; it does not include any comments that appear to have come from counsel.

Because the court has determined that the primary purpose of this communication was not to obtain legal advice, but instead to obtain review and comment of a "communications" plan by a corporate executive, and the draft does not include comments from counsel, Bard is required to produce Joint Selection 10 to Plaintiff.

| No. | Description | Privilege/Protection Asserted |
|-----|-------------|-------------------------------|
| 12 | Email reminder and handwritten notes regarding the Recovery® Filter liability meeting attended by Brian Barry, David Ciavarella, Chris Ganser, attorney Donna Passero, Esq., and Anne Patterson | Work Product |

 Bard describes Joint Selection 12 as an August 11, 2004 e-mail from Paula Pizzi (Administrative Assistant) to Brian Barry (Vice President, Corporate RA/CA), David Ciavarella (Staff Vice President, Clinical Affairs), Christopher Ganser (Vice President, Quality, Environmental Services & Safety), Donna Passero (Assistant General Counsel), and Anne Patterson (Attorney). Bard further describes the document as containing a reminder and handwritten notes regarding a Recovery Filter liability meeting attended by Mr. Barry, Dr. Ciavarella, Mr. Ganser, Ms. Passero and Ms. Patterson. In its brief, Bard argues that this document reflects the substance of meetings with attorneys regarding product liability issues, including topics, discussions, analyses, action items, and litigation strategies determined by Bard and its

counsel during such meetings and as such constitutes core work product. (Doc. # 52 at 22.)

A review of Joint Selection 12 reveals that it consists of an e-mail which serves as a calendaring invitation for a "liability meeting." There is nothing privileged about the e-mail itself, but the document also contains handwritten notes regarding the meeting. Bard has not provided any information regarding the identity of the person who made the handwritten notes. The work product doctrine covers items prepared by a party, or its representative, in anticipation of litigation. Given the fact that the notes were made on a calendaring e-mail regarding a "liability meeting," it is likely the notes can be considered to have been made in anticipation of

litigation. However, without the benefit of knowing who made the notes, the court cannot reach a conclusion on this issue. Because Bard has not met its burden, Joint Selection 12 is ordered to be produced to Plaintiff.

| No. | Description | Privilege/Protection Asserted |
|---|---|---|
| 13 | File folder for a product liability meeting on August 26, 2004 with draft chart related to proposed Recovery® Filter labeling changes including comments by attorneys Joe Hollingsworth, Esq., and Howard Holstein, Esq. | Attorney–Client Privilege |

■■■ Joint Selection 12 is a document located in a file folder for a product liability meeting on August 26, 2004, and contains a draft chart related to proposed Recovery Filter labeling changes which Bard asserts includes comments by attorneys Joe Hollingsworth and Howard Holstein. Bard asserts the attorney-client privilege with respect to this document.

The notes do appear to reflect legal advice given with respect to proposed Recovery Filter labeling changes; therefore, the court finds it comes within the attorney-client privilege and Bard is not required to produce Joint Selection 13.

| No. | Description | Privilege/Protection Asserted |
|---|---|---|
| 14 | Email requesting and reflecting legal advice of Gina Dunsmuir, Esq., about consulting agreement provided to employees who need the information to perform their job functions. | Attorney-Client Privilege |

■■■ Joint Selection 14 is described by Bard as an e-mail dated November 5, 2004, from Michelle Johnsen (Marketing Assoc.–Biopsy) to Robert Carr (R & D Program Director Intv), Janet Hudnall (Marketing Manager–Filters), Zona Michelena (Senior Administrative Assistant), Robert Righi (Senior Product Manager, PTA), and Uta Rosseck (Marketing Manager), and copying Michele Carter (Senior Marketing Manager–Stents), Dona Fiola (Senior Administrative Assistant), Erica Flynn (Conventions Coordinator), Sue Hohmann (Senior Manager, Marketing Communications), Mark Kumming (Director, Prof. Development), Candi Long (Senior Administrative Assistant), and Kevin Shifrin (Vice President, Marketing). Bard asserts that it is requesting and reflecting legal advice of Gina Dunsmuir about a consulting agreement, and it was provided to employees who needed the information to provide their job functions. Bard further claims that this e-mail reflects a request for and legal advice provided by Gina Dunsmuir concerning how and when to use a consulting agreement. (Doc. # 52 at 25.)

Bard's description of the document as Ms. Johnsen forwarding an e-mail with advice from the legal department regarding the use of consulting agreements is accurate. In addition, it appears clear that the information was forwarded to other Bard employees who needed the information to perform their job functions, thereby maintaining confidentiality.

Therefore, the court finds this document comes within the attorney-client privilege and should not be produced.

| No. | Description | Privilege/Protection Asserted |
|---|---|---|
| 15 | Privileged and confidential Attorney Memo regarding risk-benefit assessment issues relating to Recovery® Filter. | Attorney–Client Privilege; Work Product |

■■■ Bard's privilege log does not identify an author or recipient of Joint Selection 15, but in its brief it describes the document (along with Joint Selections 16, 19, 20, 21,

22, 24, 25, 26 and 47) as "documents and communications that relate to Bard Law Department's retention of Dr. John Lehmann and Dr. Richard Holcomb" that are protected by the attorney-client privilege and work product doctrine. (Doc. # 52 at 18.) Bard asserts that its Law Department retained Dr. Lehmann to conduct an independent investigation and draft an independent report concerning the Recovery Filter which was subject to product liability claims and anticipated litigation. (Doc. # 52 at 19.) Bard further claims that Dr. Lehmann and Dr. Holcomb, who was also retained to assist Dr. Lehmann in these tasks, signed consulting agreements and were made aware that the purpose of their retention was to assist the Law Department in giving legal advice to Bard, and were also advised that the results of the investigation and report should be kept confidential. (*Id.*) Bard states that Joint Selection 15 constitutes work generated by Drs. Lehmann and Holcomb, and is therefore privileged and protected work product. (*Id.* at 21.)

This document is dated November 19, 2004. Bard asserts that it received its first product liability claim concerning its Recovery Filter in February 2004. (Doc. # 52 at 19 n. 12.) By November 2004, it had received multiple product liability claims concerning its filter. (*Id.*) According to Ms. Passero's affidavit, Dr. Lehmann was retained by the Law Department at the beginning of November 2004 to provide outside consultation services regarding anticipated and ongoing product liability litigation. (Doc. # 52–3 at 2 ¶ 6.) Specifically, he was retained to conduct an investigation and prepare a report concerning the Recovery Filter, which Ms. Passero, in conjunction with the Law Department, requested in order to provide Bard with legal advice concerning the Recovery Filter and to prepare for and assist with anticipated and ongoing litigation. (*Id.* at 2–3 ¶ 6.) Dr. Lehmann was informed that the results of his investigation were to remain confidential. (*Id.* at 3 ¶ 9.)

Federal Rule of Civil Procedure 26(b)(3) protects "from discovery documents and tangible things prepared by a party or his representative in anticipation of litigation." As long as the documents were created in anticipation of litigation, the doctrine applies to investigators and consultants working for attorneys. *See Torf,* 357 F.3d at 907 (citing *United States v. Nobles,* 422 U.S. 225, 239, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975)). Given the representations made in Bard's brief and in the affidavit of Ms. Passero, the court concludes that this document is protected work product.

| No. | Description | Privilege/Protection Asserted |
|-----|-------------|-------------------------------|
| 16 | Remedial Action Plan: BPV RNF Filter Investigation regarding migration filter dated 12/9/2004 allegedly inadvertently produced by defendants | Attorney-Client Privilege<br>Work Product |

While Bard did not identify an author in its privilege log, it has since asserted that this document consists of redacted portions of Dr. Lehmann's report. (*See Doc.* # 52 at 21:8–10.) However, it is not clear who this document was distributed to for purposes of determining the confidentiality element of the attorney-client privilege. According to Ms. Passero, Dr. Lehmann submitted his final report to her on December 15, 2004. (Doc. # 52–3 at 3 ¶ 11.) The document referenced in Joint Selection 16 is dated December 9, 2004. Ms. Passero claims that she distributed the report to five Bard employees, who were instructed that it was confidential and distribution should be limited to those employees or consultants who needed it to perform their job functions. (*Id.*)

In light of the representations made in Bard's brief and Ms. Passero's declaration, the court finds that the redacted portion of this document constitutes protected work product, created by Bard's consultant, Dr. Lehmann, who was, according to Ms. Passero, retained to assist Bard's Law Department in providing legal advice to Bard in anticipation of litigation. Thus, the court will not require the redacted portion of this document to be produced.

| No. | Description | Privilege/Protection Asserted |
| --- | --- | --- |
| 17 | Email reflecting legal advice of Suzanne Carpenter (Litigation Manager) about litigation file created in anticipation of and furtherance of litigation provided to employees who need the information to perform their job functions. | Attorney-Client Privilege; Work Product |

 Joint Selection 17 is an e-mail from Janet Hudnall (Marketing Manager–Filters) to Michelle Johnsen (Marketing Assoc.–Biopsy), Zona Michelena (Senior Administrative Assistant), and Paco Varela (Manager, Internal Marketing) dated December 14, 2004. The email is forwarding on an e-mail from Donna Passero (Assistant General Counsel) regarding a "legal hold" notice. Bard represents that it was sent to employees who needed the information to perform their job functions. The original e-mail from Ms. Passero was sent to additional persons, but it appears that they were also individuals who needed this information to perform their job functions.

Accordingly, the court finds this document is protected and need not be produced.

| No. | Description | Privilege/Protection Asserted |
| --- | --- | --- |
| 19 | Memorandum reflecting legal advice of Independent Consultant regarding Recovery Filter adverse event report. | Consultant |

Joint Selection 19 is described as a December 21, 2004 memorandum from Mary Edwards (Vice President, Regular & Clinical Affairs) to Len DeCant (Vice President, Research & Development), John McDermott (President, BPV), and Doug Uelmen (Vice President, Quality Assurance), and copying Shari Allen (Director, Regulatory Affairs) and Kellee Jones (Executive Administrative Assistant). In its brief, Bard asserts that the redacted portion of this document reflects portions of Dr. Lehmann's report. (Doc. # 52 at 21.)

The court has reviewed the instant document, and as the court concluded with respect to Joint Selection 16, it finds that the redacted portions of this document are similarly protected by the work product doctrine and need not be produced.

| No. | Description | Privilege/Protection Asserted |
| --- | --- | --- |
| 20 | Document from client to client reflecting legal advice of Independent Consultant regarding Remedial Action Plan. | Consultant |

Bard indicates that this is a document from Kellee Jones (Executive Administrative Assistant) dated December 22, 2004, to Robert Carr (R & D Program Director Intv) and Janet Hudnall (Marketing Manager–Filters) and copying Doug Uelmen (Vice President, Quality Assurance) which reflects legal advice of a consultant regarding the Remedial Action Plan. Again, Bard represents that the redacted portion of this document reflects portions of Dr. Lehmann's report. (Doc. # 52 at 21.) The court will construe Bard's assertion of the "consultant" privilege as actually asserting the attorney-client privilege and work product doctrine as to its consultant, Dr. Lehmann.

The court has reviewed this document, and finds that it includes the same portions of Dr. Lehmann's report that were redacted from Joint Selections 16 and 19. Therefore, the court concludes that the redacted portions in Joint Selection 20 are also protected work product that need not be produced.

| No. | Description | Privilege/Protection Asserted |
| --- | --- | --- |
| 21 | Email and attachments reflecting communications and work conducted by Rich Holcomb regarding report and followup items, including study design, created at the direction of Bard counsel and in anticipation and furtherance of litigation. | Attorney-Client Privilege; Work Product |

■ Bard describes Joint Selection 21 as an e-mail and attachments reflecting communications and work conducted by Rich Holcomb created at the direction of Bard counsel and in anticipation and furtherance of litigation.

The document is an e-mail dated January 3, 2005, from David Ciavarella (Staff Vice President, Clinical Affairs) to Shari Allen (Director, Regulatory Affairs), Len DeCant (Vice President, Research and Development), Janet Hudnall (Marketing Manager–Filters), John McDermott (President, BPV), and Doug Uelmen (Vice President, Quality Assurance) and copying Brian Barry (Vice President, Corporate RA/CA). It indicates that it is forwarding on comments from consultant, "R. Holcomb."

In its Brief, Bard asserts that Joint Selection 21 constitutes a communication "between and among the consultants and Bard's employees and reflect[s] the scope of [his] retention by the Law Department." (Doc. # 52 at 21.)

According to Ms. Passero, in mid-November 2004, Richard Holcomb was retained to assist Dr. Lehmann with certain aspects of his report that Bard's Law Department had requested for the purpose of providing Bard legal advice concerning the Recovery Filter and to prepare for and assist with anticipated and ongoing litigation. (Doc. # 52–3 at 4 ¶ 13.) Ms. Passero confirms that Mr. Holcomb was aware that he was commissioned for this purpose, and that he was informed that the results of his work should only be relayed to Bard's Law Department or to those whom Bard's Law Department should direct. (*Id.* ¶ 16.) Ms. Passero further states that Dr. Holcomb assisted Dr. Lehmann with his investigation during November and December 2004 and during this time, and at her direction and the direction of the Law Department, Dr. Holcomb communicated with a small number of Bard employees to obtain and provide information to fulfill his duties under the consulting contract. (*Id.* ¶ 17.)

The e-mail from David Ciavarella directly references advice given by Dr. Holcomb.

Given Ms. Passero's representations regarding the capacity in which Dr. Holcomb was retained in November and December 2004, and the fact that this e-mail generally correlates with the time frame he was retained to assist in providing legal advice to Bard in anticipation of litigation, the court concludes that this constitutes protected work product and need not be produced.

| No. | Description | Privilege/Protection Asserted |
|-----|-------------|-------------------------------|
| 22 | Remedial Action Plan: BPV RNF Filter Investigation regarding migration filter dated 1/6/2005 allegedly inadvertently produced by defendants. | |

According to Bard, the redacted portion of this document consists of the actual report submitted by Dr. Lehmann. (Doc. # 52 at 21.)

For the reasons asserted in connection with Joint Selection Nos. 16, 19, and 20, the court finds that the redacted portion of Joint Selection 22 is also protected work product and need not be produced.

| No. | Description | Privilege/Protection Asserted |
|-----|-------------|-------------------------------|
| 23 | Email reflecting legal advice from attorney Gina Dunsmuir regarding consulting agreements. | Attorney-Client Privilege |

■ Joint Selection 23 is described as an e-mail from Janet Hudnall (Marketing Manager–Filters) to Shari Allen (Director, Regulatory Affairs), Robert Carr (R & D Program Director Intv), David Ciavarella (Staff Vice President, Clinical Affairs), Len DeCant (Vice President, Research & Development), John McDermott (President, BPV), Kevin Shifrin (Vice President, Marketing), and Doug Uelmen (Vice President, Quality Assurance), and copying Gina Dunsmuir (Assistant General Counsel). Bard asserts that it re-

flects legal advice from Gina Dunsmuir regarding consulting agreements.

Unlike Joint Selection 14, Joint Selection 23 consists of several e-mails where Ms. Dunsmuir is merely copied. The content of the e-mails do not appear to contain any advice given by Ms. Dunsmuir. Nor are any questions posed that could be interpreted as requesting legal advice. Accordingly, the court finds that Joint Selection 23 does not come within the attorney-client privilege, and is ordered to be produced to Plaintiff.

| No. | Description | Privilege/Protection Asserted |
| --- | --- | --- |
| 24 | Report prepared in anticipation of litigation by client containing legal advice of Independent Consultant regarding the Recovery Filter. | Consultant |

This document is described as a report from Kellee Jones (Executive Administrative Assistant) to Janet Hudnall (Marketing Manager–Filters) and copying Doug Uelmen (Vice President, Quality Assurance) purportedly in anticipation of litigation and containing the advice of an independent consultant regarding the Recovery Filter. Bard claims that the redacted parts of this document contain portions of Dr. Lehmann's report. (Doc. # 52 at 21:8–10.)

The portions of the report that are redacted are the same portions that the court has concluded constitute work product in Joint Selections 16, 19, 20 and 22. As such, the court similarly finds the redacted portions of Joint Selection 24 to be protected work product as they were forwarded within the company to individuals who needed the information to perform their jobs. Therefore, Joint Selection 24 need not be produced to Plaintiff.

| No. | Description | Privilege/Protection Asserted |
| --- | --- | --- |
| 25 | File folder regarding clinical data strategies for Recovery® Filter with March 2005 report by Independent Consultant # 1 and Richard Holcomb regarding clinical data strategies for Recovery® Filter. | Attorney–Client Privilege; Work Product |

This document is described as a file folder from John Lehmann and Richard Holcomb to David Ciavarella (Staff Vice President, Clinical Affairs) and copying Donna Passero (Assistant General Counsel), Brian Barry (Vice President, Corporate RA/CA), and Chris Ganser (Vice President, Quality, Environmental Services and Safety), including a March 2005 report by Drs. Lehmann and Holcomb regarding clinical data strategies for the Recovery Filter.

This report, on its face, states that it is privileged and confidential attorney work product, pursuant to a contract dated November 12, 2004. In addition, it appears that this is the report which Dr. Lehmann and Dr. Holcomb were directed to prepare by Bard's Law Department. Accepting as true Ms. Passero's representations that he was retained for the purpose of conducting an investigation and drafting a report concerning the Recovery Filter for the purpose of providing Bard with legal advice concerning the Recovery Filter and to prepare for and assist with anticipated and ongoing litigation, the court finds that the report set forth in Joint Selection No. 25 is protected work product.

| No. | Description | Privilege/Protection Asserted |
| --- | --- | --- |
| 26 | Email reflecting communication and work conducted by Rich Holcomb and John Lehmann regarding report and follow-up items created at the direction of Bard counsel and in anticipation of and furtherance of litigation. | Attorney-Client Privilege; Work Product |

Joint Selection No. 26 is described as a March 24, 2005 e-mail from Charis

Campbell (Clinical Affairs Manager) to Christopher Guerin (Senior Clinical Research Associate) and copying Shari Allen (Director, Regulatory Affairs), Robert Carr (R & D Program Director Intv), and Janet Hudnall (Marketing Manager–Filters) reflecting a communication and work conducted by Rich Holcomb and John Lehmann regarding their report and follow-up items created at the direction of counsel and in anticipation and in furtherance of litigation. Bard further describes Joint Selection 26 as a communication between and among these consultants and Bard employees which reflect the scope of retention by the Law Department. (Doc. # 52 at 21:10–12.)

A review of Joint Selection 26 reveals that this e-mail forwards an initial e-mail from Dr. Holcomb to Christopher Guerin and copying Shari Allen and David Ciavarella regarding a Recovery Filter Registry. According to Ms. Passero, Dr. Holcomb was retained in mid-November 2004 to assist Dr. Lehmann with certain aspects of the report that the Law Department requested to provide Bard with legal advice concerning the Recovery Filter and to prepare for and assist with anticipated and ongoing litigation. (Doc. # 52–3 at 4 ¶ 13.) Ms. Passero also states that following submission of the report, Dr. Holcomb continued to assist Dr. Lehmann, Ms. Passero and the Law Department, through the spring of 2005, with follow-up items related to and arising out of the report. (Id. at 4–5 ¶ 18.) While Ms. Passero represents that Dr. Holcomb provided additional follow-up services to Bard after Dr. Lehmann submitted his report, there is nothing in her declaration, in Joint Selection 26, or in Bard's briefing that indicates this e-mail from Mr. Holcomb, referencing a Recovery Filter registry, was prepared in anticipation of litigation. Instead, taking into account the content and context of the e-mail, including the fact that legal counsel are not even included in the e-mails, the court finds that it was prepared for a business purpose, taking it outside the scope of the work product doctrine. Nor can the court conclude that this document comes within the attorney-client privilege.

As such, the court orders that Joint Selection 26 be produced to Plaintiff.

| No. | Description | Privilege/Protection Asserted |
| --- | --- | --- |
| 27 | Email and attachments conveying privileged information about filter testing created in anticipation of litigation and provided to employees who need the information to perform their job functions. | Work Product |

Joint Selection 27 is described as an e-mail and attachments from Cindi Walcott (Senior Manager, Field Assurance) to Richard Bliss (quality consultant) and blind copying Frank Madia (manufacturing) which Bard asserts conveyed privileged information about filter testing created in anticipation of litigation and provided to employees who needed the information to perform their job functions. Thus, Bard asserts it is protected work product. Bard further claims that this is a communication "between Bard employees ... discussing and taking actions regarding testing of a filter explicitly because of ongoing litigation." (Doc. # 52 at 26.)

While this document references filter testing related to litigation, there is no declaration from anyone in the legal department stating that Richard Bliss was retained to provide consultative services to Bard in anticipation of litigation or that the subject testing was done at the direction of the Law Department. Ms. Passero's affidavit contains no reference to Mr. Bliss or the filter testing. Having failed to meet the burden of establishing this document is protected work product, the court finds that Bard must produce Joint Selection 27 to Plaintiff.

| No. | Description | Privilege/Protection Asserted |
| --- | --- | --- |
| 29 | Email to Donna Passero, Esq., about customer communication concerning Recovery Filter. | Attorney–Client Privilege |

■ Joint Selection 29 is described as an August 17, 2005 e-mail from Richard Bliss (quality consultant) to Shari Allen (Director, Regulatory Affairs), Brian Barry (Vice President, Corporate RA/CA), and copying Christopher Ganser (Vice President, Quality, Environmental Services and Safety). Bard also describes this as an e-mail to Donna Passero about customer communication concerning the Filter, even though she is not listed under the recipients.

A review of Joint Selection 29 reveals that the initial e-mail in the chain is dated May 11, 2005, from Kellee Jones to Donna Passero (Assistant General Counsel) and copying Shari Allen, Brian Barry and Doug Uelmen regarding an attached "Colleague Letter" for the Recovery Filter. The attachment is not included as part of Joint Selection 29. This e-mail was then forwarded on the same date from Shari Allen to Ute Willhauck, David Marshall, Dennis Stokoe, and Ian Frigero asking for comments about the letter. Nota-

bly, Bard has not identified the positions or associations of Ute Willhauck, David Marshall, Dennis Stokoe, and Ian Frigero in connection with this Joint Selection. That e-mail, in turn, was forwarded on August 16, 2005 (some three months later) from Shari Allen to Brian Barry and Rich Bliss which brings up a point of which geographies the "Colleague Letter" should be sent. Richard Bliss then sent a response to Shari Allen and Brian Barry, dated August 17, 2005, and copying Christopher Ganser.

It is important to note that no one from the Law Department was included in Richard Bliss's response. Moreover, the communications do not reflect a confidential nature. Nor do any of the e-mails indicate the solicitation or provision of legal advice. As a result, the court cannot conclude that Joint Selection 29 comes within the attorney-client privilege. Therefore, Joint Selection 29 should be produced to Plaintiff.

| No. | Description | Privilege/Protection Asserted |
|-----|-------------|-------------------------------|
| 30 | Emails requesting and reflecting legal advice of Donna Passero, Esq, and Suzanne Carpenter (Litigation Manager) about Recovery Filter consultant sent because of pending litigation. | Attorney-Client Privilege; Work Product |

Joint Selection 30 is described as a chain of e-mails dated September 20, 2005, from Janet Hudnall (Marketing Manager--Filters) to John Kaufman (Director, Professor Dotter Interventional Institute), which reflect the legal advice of Donna Passero (Assistant General Counsel) and Suzanne Carpenter

(Litigation Manager) about a Recovery Filter consultant sent because of pending litigation.

Bard's description of Joint Selection 30 accurately describes the communication which the court concludes is subject to the attorney-client privilege and need not be produced.

| No. | Description | Privilege/Protection Asserted |
|-----|-------------|-------------------------------|
| 32 | Email regarding legal advice of Richard North, Esq., and Bard Legal Department about Recovery Filter provided to employees who need the information to perform their job functions. | Attorney-Client Privilege; Consultant; Work Product |

Joint Selection 32 is described as an e-mail dated October 7, 2005, from Judy Ludwig (Document Control Supervisor) to Wendy Hayes (Quality Systems Manager) regarding legal advice of Richard North and the Bard Law Department about the Filter provided to employees who needed the information to perform their job functions.

It appears that the document, which consists of an e-mail chain, has been produced in

redacted form to Plaintiff. The only portion that has been redacted is the last e-mail in the chain, described above.

After reviewing the redacted portion of the document, the court concludes that it contains the advice of counsel, being provided to Bard employees who needed the information to perform their jobs, and is subject to the

attorney-client privilege and need not be produced.

| No. | Description | Privilege/Protection Asserted |
|-----|-------------|-------------------------------|
| 33 | Email discussing IVC filter complaint and sent in anticipation of potential litigation. | Work Product |

■ Joint Selection 33 is described as a November 9, 2005 e-mail from Cindi Walcott (Senior Manager, Field Assurance) to Gin Schulz (Quality Assurance) discussing an IVC Filter Complaint, which Bard claims is protected work product because it was sent in anticipation of litigation.

This document actually encompasses two e-mails. The first e-mail, was sent on November 9, 2005, from what appears to be a Japanese medical company, to Cindi Walcott, asking certain questions that the Japanese medical company received from a customer about a filter. Ms. Walcott then forwarded this e-mail to Gin Schulz, asking him to review the questions and asking whether she should send a response or forward the e-mail over to the legal department.

There is no indication that this document was prepared at the direction of (in-house or outside) counsel in anticipation of litigation. While any communication eventually directed to the legal department regarding the underlying e-mail might be protected, these communications are not. Therefore, Bard shall produce Joint Selection 33 to Plaintiff.

| No. | Description | Privilege/Protection Asserted |
|-----|-------------|-------------------------------|
| 34 | Document regarding legal advice about Monthly Project Review Meeting. | Attorney–Client Privilege |

■ Joint Selection 34 is described as a December 2, 2005 document from Kristin Muir (Executive Administrative Assistant) regarding legal advice about a Monthly Project Review Meeting. Bard claims this document is subject to the attorney-client privilege.

In its brief, Bard argues that these monthly meeting minutes contain information regarding action items to be taken by in-house intellectual property lawyers, and this portions of the minutes were redacted. (Doc. # 52 at 26.) Specifically, Bard claims that the redacted portion of this document reflects a request for legal advice from Khoi Ta, Esq., regarding product design. Bard further asserts that there has been no waiver by including these items in a memorandum distributed to other Bard employees who needed the information to perform their jobs related to research and development.

A review of the document reveals that it consists of a memorandum that appears to have actually been sent from Len DeCant (Vice President, Research & Development) to a distribution list titled "Distribution" on December 2, 2005 with the following subject line: "Monthly R & D Project Review Action Items—November 23, 2005." Bard apparently produced a redacted version to Plaintiff. The only portion of this document redacted was a reference to an action item for Khoi Ta, Wolfgang Summer, and Thiemo Bank regarding proposed designs.

Preliminarily, the court notes that Bard has not identified the positions of Wolfgang Summer and Thiemo Bank within the corporation. Next, the court cannot conclude that this meeting minute action item was intended to be confidential. It was distributed to a very large distribution list, which goes against Bard's assertion that it was sent only to people who needed the information to perform their jobs. Moreover, the meeting minutes merely reference an action item related to what an attorney was going to discuss in the future. It provides no details regarding the discussion, other than the topic, and does not reflect the actual solicitation or provision of legal advice. Accordingly, the court cannot conclude that Joint Selection 34 comes within the attorney-client privilege. As such, Joint Selection 34 should be produced to Plaintiff in its unredacted form.

| No. | Description | Privilege/Protection Asserted |
|-----|-------------|-------------------------------|
| 35 | Email reflecting actions taken for purposes of obtaining legal advice of Richard North, Esq., and Donna Passero, Esq., about IVC filter complaint provided to employees who need the information to perform their job functions. | Attorney-Client Privilege |

 Joint Selection 35 is described as an e-mail from Gin Schulz (Quality Assurance) to Micky Graves (Senior Engineer) and Natalie Wong (Quality Assurance Engineer) and copying Brian Hudson (Quality Control Manager) regarding action taken for the purpose of obtaining legal advice from Richard North and Donna Passero about an IVC filter complaint provided to employees who needed the information to perform their job functions.

A review of Joint Selection 35 reveals that it consists of two e-mails. The first is an e-mail dated January 13, 2006, from Natalie Wong to Gin Schulz and Micky Graves referencing an attachment with an update for a filter complaint. The second e-mail is the response of Gin Schulz, sent on January 15, 2006, to Natalie Wong, Micky Graves, and copying Brian Hudson, stating that he would like to forward the attachment and another document to counsel. However, with the e-mail itself, there is no disclosure of any confidential information. Nor does the e-mail in and of itself pose a request for legal advice. As such, the court finds it does not come within the attorney-client privilege, and Joint Selection 35 must be produced to Plaintiff.

| No. | Description | Privilege/Protection Asserted |
|-----|-------------|-------------------------------|
| 36 | Email and attachments reflecting request for legal advice of Brian Leddin, Esq., about risk analysis and provided to employees who need the information to perform their job functions. | Attorney-Client Privilege |

 Joint Selection 36 is described as a March 2, 2006 e-mail and attachments from Gin Schulz (Quality Assurance) to Brian Hudson (Quality Control Manager) which Bard asserts reflects a request for legal advice from attorney Brian Leddin about risk analysis that was provided to employees who needed the information to perform their job functions.

A review of Joint Selection 36 reveals an e-mail header indicating that an e-mail was sent on March 2, 2006, from Gin Schulz sending attachments to Brian Hudson. Below that e-mail header is another e-mail header, indicating that an e-mail was sent on March 1, 2006, from Candi Long (Executive Assistant, Quality Assurance) to Brian Leddin and copying Gin Schulz. The e-mail asks Bard's in-house attorney, Mr. Leddin, to review the attachments and forward them to Brian Barry and Pete Palermo. The attachments appear to follow. They consist of a Recovery Filter update and a memorandum dated February 17, 2006, which contains meeting minutes for a Recovery Filter team meeting which took place on February 15, 2006.

While Ms. Long's e-mail asks Mr. Leddin to review and forward the attachments on to Brian Barry and Pete Palermo, nothing in the e-mail or in the attachments themselves indicates that this was a confidential communication either providing legal advice or soliciting legal advice. The e-mail does not ask Mr. Leddin for any comments or other information in response which could be construed as a request for legal advice. Incidentally, these documents eventually were forwarded to Brian Hudson, and in turn, to Gin Schulz. Bard has not provided a declaration from counsel, or from any of the recipients, to establish the elements of attorney-client privilege.

As a result, the court finds it has not met its burden and Joint Selection 36 shall be produced to Plaintiff.

| No. | Description | Privilege/Protection Asserted |
|-----|-------------|-------------------------------|
| 37 | Email and attachments reflecting request for legal advice from Gina Dunsmuir and Donna Passero | Attorney–Client Privilege |

■ Joint Selection 37 is described as a March 9, 2006 e-mail and attachments from Genevieve Balutowski (Senior Regulatory Affairs Specialist) to Shari Allen (Director, Regulatory Affairs), Brian Barry (Vice President, Corporate RA/CA), Robert Carr (R & D Program Director Intv), David Ciavarella (Staff Vice President, Clinical Affairs), Gina Dunsmuir (Assistant General Counsel), Micky Graves (Senior Engineer), Janet Hudnall (Marketing Manager, Filters), Donna Passero (Assistant General Counsel), Charlie Simpson (Senior Director, Research & Development), TPE–Mojave (Distribution Group), Natalie Wong (Quality Assurance Engineer), and Dionne Woods (Regulatory Affairs Specialist), reflecting a request for legal advice from Gina Dunsmuir and Donna Passero about a response to MHRA Recovery Filter questions.

The court has reviewed Joint Selection 37 and has determined that it does indeed constitute a request for legal advice from in-house counsel. It appears to have been sent to those employees who needed the information to complete their job functions so as not to destroy confidentiality. As a result, the court finds Joint Selection 37 comes within the attorney-client privilege and need not be produced to Plaintiff.

| No. | Description | Privilege/Protection Asserted |
| --- | --- | --- |
| 38 | Email reflecting advice of Brian Leddin, Esq., about potential response to competition sales tactics provided to employees who need the information to perform their job functions. | Attorney-Client Privilege |

■ Joint Selection 38 is described as a June 6, 2006 e-mail from Janet Hudnall (Marketing Manager, Filters) to Shari Allen (Director, Regulatory Affairs), which Bard asserts reflects legal advice from attorney Brian Leddin about a potential response to competition sales tactics provided to employees who needed the information to perform their job functions.

Joint Selection 38 actually consists of a string of e-mails, and the court cannot conclude that the attorney-client privilege applies to the entire e-mail chain. The court will start by describing, without revealing the privileged material, the e-mail chain where the privilege commences. On June 3, 2006, Janet Hudnall sent an e-mail to Shari Allen, Gin Schulz, John McDermott, Kevin Shifrin, and attorney Brian Leddin forwarding an attached e-mail thread and clearly asking for legal advice regarding the forwarded e-mail thread. The court finds that the e-mail and forwarded thread are a confidential communication requesting legal advice that come within the attorney-client privilege and need not be produced to Plaintiff. To be clear, the e-mails included in the thread appear to have been discoverable standing alone because they did not involve an attorney-client communication and there is no indication they were protected work product. However, to the extent the e-mail thread was then forwarded to counsel with a request for legal advice, the communication becomes privileged.

After Janet Hudnall sent her e-mail asking for legal advice, and including Shari Allen in the request for legal advice, Shari Allen then sent the e-mail to Brian Barry (a non-legal employee) on June 4, 2006, asking for his input. This e-mail, standing alone, is not privileged, and should be produced to Plaintiff.

Brian Barry then sent a response to Shari Allen's e-mail on June 5, 2006. Again, this e-mail standing on its own is not privileged, and should be produced, by itself, to Plaintiff. On June 6, 2006, Shari Allen forwarded Brian Barry's response to Janet Hudnall. This e-mail, standing alone, is not privileged and should be produced to Plaintiff. Likewise, Janet Hudnall's response to Shari Allen, does not contain a confidential communication, and standing alone, should be produced to Plaintiff.

In sum, Bard must produce a redacted version of Joint Selection 38 to Plaintiff. Bard can redact the portion starting with Janet Hudnall's e-mail on June 3, 2006 as well as the e-mails that preceded it in time and were forwarded along with the request

to counsel. The e-mails subsequent in time to this email should not be redacted.

| No. | Description | Privilege/Protection Asserted |
|-----|-------------|-------------------------------|
| 39 | Email and attachments reflecting request for filter information from Richard North, Esq., in furtherance of litigation and provided to employees who need the information to perform their job functions. | Attorney–Client Privilege; Work Product |

Joint Selection 39 is described as a June 26, 2006 e-mail and attachments from Natalie Wong (Quality Assurance Engineer) to Gin Schulz (Quality Assurance) and copying Brian Hudson (Quality Engineer Manager), which Bard describes as reflecting a request for filter information from attorney Richard North in furtherance of litigation, which was provided to employees who needed the information to perform their job functions. Bard asserts that Joint Selection 39 is covered by the attorney-client privilege and work product doctrine.

Joint Selection 39 does appear to be a confidential communication from outside counsel Richard North to Bard employees who needed the information to perform their job functions. As such, the court finds Joint Selection 39 comes within the attorney-client privilege. After reviewing the communication, the court finds it is also reasonable to conclude that the document was prepared in anticipation of litigation so as to constitute protected work product.

| No. | Description | Privilege/Protection Asserted |
|-----|-------------|-------------------------------|
| 40 | Email regarding legal advice about litigation provided to employees who need the information to perform their job functions. | Attorney-Client Privilege; Work Product |

Joint Selection 40 is described as an August 12, 2006 e-mail from Judith Ludwig (Document Control Supervisor) to Shari Allen (Director, Regulatory Affairs), Robert Carr (R & D Program Director Intv), Mike Casanova (R & D Program Director), Len DeCant (Vice President, Research & Development), Joe DeJohn (Vice President, Sales), Janet Hudnall (Marketing Manager–Filters), Brian Hudson (Quality Engineering Manager), Stephanie Klocke (Senior Engineer), Bill Krueger (Senior Manager, Finance), Gin Schulz (Quality Assurance), Imtiaz Shamji (Director, Quality Systems), Kevin Shifrin (Vice President–Marketing), Charlie Simpson (Senior Director, Research & Development), Kendra Sinclair–McGee (Field Assurance Administrator), Gary Sorsher (Director, Quality Engineering), Michael Terlizzi (Vice President, Biopsy Sales & Marketing), Cindi Walcott (Senior Manager, Filed Assurance), Mike Warren (Senior Manager, Human Resources), Natalie Wong (Quality Assurance Engineer), and copying Suzzane Carpenter (Litigation Manager, Bard Legal Department), Candi Long (Senior Administrative Assistant), John McDermott (President, BPV), and Mary Minske (Executive Assistant). Bard asserts that it concerns legal advice about litigation provided to employees who needed the information to perform their job functions.

A review of Joint Selection 40 reveals that it is protected work product; therefore, it need not be produced to Plaintiff.

| No. | Description | Privilege/Protection Asserted |
|-----|-------------|-------------------------------|
| 42 | Email requesting legal advice of Brian Leddin, Esq., about responses to physician's questions about product. | Attorney-Client Privilege |

Joint Selection 42 is described as an October 12, 2006 e-mail from Shari Allen (Director, Regulatory Affairs) to Janet Hudnall (Marketing Manager, Filters) and copying Brian Leddin (Associate General Counsel,

Litigation and Compliance), requesting legal advice about responses to a physician's questions about a product.

This e-mail, while sent directly to Janet Hudnall, copies Brian Leddin, and specifically discusses a request for his advice about the forwarded e-mail. The court recognizes there are instances where simply copying an attorney does not bring the document within the attorney-client privilege, but here, in the context of this particular document, copying Mr. Leddin had the same effect as e-mailing him directly for advice. As such, the court finds that Joint Selection 42 comes within the attorney-client privilege and need not be produced.

| No. | Description | Privilege/Protection Asserted |
|-----|-------------|-------------------------------|
| 43 | Portion of document reflecting legal advice and activities of Enrique Abarca, Esq., concerning trademark and patent issues. | Attorney-Client Privilege |

Joint Selection 43 is described as a document dated June 27, 2007, sent to a variety of individuals, which Bard claims reflects, in part, legal advice and activities of Enrique Abarca concerning trademark and patent issues. The portion that Bard contends includes legal advice was redacted.

The court agrees that the redacted portion of Joint Selection 43 is protected by the attorney-client privilege and need not be produced.

| No. | Description | Privilege/Protection Asserted |
|-----|-------------|-------------------------------|
| 44 | Email regarding advice of Greg Dadika, Esq., about a recovery filter article provided to employees who need the information to perform their jobs. | Attorney-Client Privilege |

Joint Selection 44 is described as an August 22, 2008 e-mail from Bret Baird (Marketing Manager) to Genevieve Balutowski (Senior Regulatory Affairs Specialist), Deb Bebb (Senior R & D Technician), Brian Boyle (Research & Development), Robert Carr (R & D Program Director Intv), Andre Chanduszko (Staff Engineer), Jon Conaway (Quality Assurance), Signor Copple (Planner, Manufacturing), Brett Curtice (Senior Technician), Jose Garcia (Engineer), Inbal Lapid (Engineer I), Jim O'Brien (Research & Development), Jeffrey Pellicio (Marketing), Mike Randall (Project Lead, Research & Development), Lisa Wilensky (Finance Manager) and copying Mark Wilson (Senior Quality Engineer). Bard claims that this document is regarding legal advice of Greg Dadika about a recovery filter article provided to employees who needed the information to perform their job functions.

The court concludes that this e-mail is forwarding on a privileged attorney-client communication to employees at Bard who needed the information to perform their job functions. Therefore, it need not be produced to Plaintiff.

| No. | Description | Privilege/Protection Asserted |
|-----|-------------|-------------------------------|
| 45 | Portion of document reflecting request for and legal advice of Bard Corporate Legal Department, including Gina Dunsmuir, regarding product risk assessment and potential legal implications of changes to IFU and product indication and provided to employees who need the information to perform their jobs. | Attorney-Client Privilege |

Joint Selection 45 is described as a portion of a document dated December 24, 2008, from Bret Baird (Marketing Manager) to Bill Little (Senior Manager, Marketing), which Bard claims reflects a request for and legal advice of the Bard Law Department, including Gina Dunsmuir, regarding product risk assessment and potential legal implications of changes to IFU and product indica-

tion, which were provided to Bard employees who needed the information to perform their job functions. In its brief, Bard indicates that the redacted portion of Joint Selection 45 reflects Bard's intention to seek legal advice from Ms. Dunsmuir, and is therefore privileged. (Doc. # 52 at 29.)

This document is a memorandum dated December 23, 2008, from Bret Baird to Bill Little with the subject line: "IVC Filter Monthly Marketing Report–December 2008." Bard has redacted a small portion of the memorandum, asserting it comes within the attorney-client privilege. However, upon a review of the document, the court concludes that the redacted portion actually describes a discussion that was held among "team members, board members, and corporate" regarding potential product risks. While the memorandum states that the team will meet in the future with Ms. Dunsmuir to discuss the topic further, this memorandum itself contains no privileged communications. As a result, Bard must produce Joint Selection 45, in unredacted form, to Plaintiff.

| No. | Description | Privilege/Protection Asserted |
|-----|-------------|-------------------------------|
| 46 | Email and attachments reflecting legal advice about filter internal talking points provided to employees who need the information to perform their jobs. | Attorney-Client Privilege |

Joint Selection 46 is described as an August 11, 2010 e-mail and attachments from Bill Little (Senior Manager, Marketing) to Guillermo Altonaga (consultant) and Brian Hudson (Quality Engineer Manager) and copying Gin Schulz (Quality Assurance) and John Van Vleet (Senior Manager, RA/CA), reflecting legal advice about filter internal talking points. Bard claims it was provided to employees who needed the information to perform their job functions. In its brief, Bard asserts that Joint Selection 46 is an attachment to an e-mail that "on its face, indicates that it was created at the direction of Bard's counsel." (Doc. # 52 at 29.)

From a review of the document, it appears that Bill Little was forwarding its consultant, Bill Altonaga, a document which was pre-pared by counsel for internal use only, in response to his request for such information. The attachment forwarded to Mr. Altonaga is clearly marked "attorney client privileged, prepared at the request of counsel" and is also marked "confidential-internal use only." While these marks are not dispositive, they do indicate in this instance the desire to maintain the document's confidentiality and privileged nature. Coupled with the nature of the communication, the court concludes that Mr. Little's action of forwarding the attorney-client communication to its agent did not defeat confidentiality. The court therefore finds Joint Selection 46 comes within the attorney-client privilege and need not be produced to Plaintiff.

| No. | Description | Privilege/Protection Asserted |
|-----|-------------|-------------------------------|
| 47 | File created by Dr. John Lehmann—who was retained by Donna Passero, Esq., for purposes of providing consultant services to Bard regarding ongoing product liability litigation—and maintained by Dr. Lehmann for purposes of drafting his report, and for follow-up items conducted by him, pursuant to Nov 2004 contract with Bard's Corporate Legal Department. File contains draft and final report, correspondence with Bard concerning the same, and additional materials kept for purposes of fulfilling his obligations under his contract with Bard's Corporate Legal Department. | Attorney–Client Privilege |

Joint Selection No. 47 is a file created by Dr. John Lehmann, who Bard maintains was retained by Donna Passero for the purposes of providing consulting services to Bard in anticipation of and in furtherance of litigation. Joint Selection 47 consists of a

draft of Dr. Lehmann's report, correspondence with Bard concerning the draft report, and additional materials Dr. Lehmann maintained in his file, which Bard asserts were kept to fulfill the obligations under his contract. In its brief, Bard argues that the materials in the file represent Dr. Lehmann's thought processes and opinions, which were commissioned by Bard's law department, and are therefore protected. (Doc. # 52 at 21.)

A review of Joint Selection 47 reveals that it contains file materials as well as various versions of Dr. Lehmann's report, which were provided to Ms. Passero, and a limited number of Bard employees. Joint Selection 47 also contains the printed slides of a power point presentation which appears to be based on his report and was presented to Bard's Law Department. In addition, included are communications between Dr. Lehmann and Dr. Holcomb, as well as communications between Dr. Lehmann and outside counsel Richard North and some communication with a limited number of Bard employees regarding his report and findings. Notably, Joint Selection 47 also contains a communication between Dr. Lehmann and the Bard Law Department memorializing the agreement for his retention.

While the court acknowledges that Bard could have provided a more detailed description of these materials so that Plaintiff could assess the privilege claim, the court has undertaken a thorough review of the materials contained within Joint Selection 47 and concludes, based on the content of the materials and in light of the representations made in Ms. Passero's declaration, that it comes within the attorney-client privilege and is protected work product. Joint Selection 47 need not be produced to Plaintiff.

| No. | Description | Privilege/Protection Asserted |
|---|---|---|
| 48 | Documents collected by client at the request of and for use by outside counsel (Richard North, Esquire) in connection and furtherance of ongoing litigation. | Attorney-Client Privilege; Work Product |

Bard has described Joint Selection 48 as documents collected by the client at the request of and for use by outside counsel, Richard North, in connection with and in furtherance of ongoing litigation, so as to be protected work product and subject to the attorney-client privilege. In support of this, Bard has filed the affidavit of Quality Assurance Manager Judith Ludwig. (*See* Doc. # 52 at 29–30, Doc. # 52–4 at 2.) Ms. Ludwig states that she worked in Bard's Document Control department from September 2003 until September 2012. (*Id.* ¶ 2.) Her responsibilities included, among other things, assisting in-house and outside counsel in collecting and maintaining documents to be used for potential and ongoing litigation. (*Id.* ¶ 4.) She specifically recounts that in 2005, at the request of Mr. North, she collected and maintained certain documents for use by Mr. North in connection with his provision of counsel to Bard regarding ongoing litigation. (*Id.* ¶ 5.) These materials were kept in a folder titled "Litigation–Richard North." (*Id.* ¶ 6.)

Bard acknowledges that these documents, in and of themselves, are not privileged, and does not assert a privilege to any of the individual documents, but maintains that the file represents the selection and compilation of the documents by Mr. North, as maintained by Ms. Ludwig, and thereby constitute opinion work product protecting the production of the file from discovery. (Doc. # 52 at 29–30.)

In light of the representations made by Ms. Ludwig, the court finds that the litigation file, compiled by Ms. Ludwig at the direction of Mr. North, and set forth in Joint Selection 48 is protected work product and need not be produced.

| No. | Description | Privilege/Protection Asserted |
|---|---|---|
| 49 | Chart associated with the Recovery® Filter assessing regulatory and litigation risks. | Attorney-Client Privilege; Work Product |

■ Joint Selection 49 is described as a chart associated with the Recovery Filter which assesses regulatory and litigation risks. Bard argues, "Document 49, while undated, reflects on its face it was created with litigation in mind. As such, it is work-product, as it was created 'because of' litigation." (Doc. # 52 at 22.)

It is problematic that Bard has not identified who prepared this document or to whom it was sent. A review of the document seems to indicate it *may* have been prepared in anticipation of litigation, but along with failing to identify the author of the document, Bard has not provided an affidavit supporting the assertion it was prepared "because of" litigation. Therefore, the court must conclude that Bard has not carried its burden of establishing the elements of attorney-client privilege or work product protection with respect to Joint Selection 49, and it must be produced to Plaintiff.

| No. | Description | Privilege/Protection Asserted |
|-----|-------------|-------------------------------|
| 50 | Corporate Management Committee reports and/or summaries containing and reflecting Bard Legal Department's analysis and summary of ongoing and potential litigation prepared by the Bard Legal Department for purposes of providing legal advice to the corporation and in anticipation and/or furtherance of litigation. | Attorney-Client Privilege; Work Product |

■ Joint Selection 50 consists of Bard's Corporate Management Committee Reports and/or summaries which Bard asserts contain or reflect the Law Department's analysis and summary of ongoing and potential litigation, prepared by Bard's Law Department for the purpose of providing Bard with legal advice and in anticipation and/or in furtherance of litigation. Bard elaborates on this description in its brief, stating:

> Privileged Document No. 50 consists of two exemplar Law Department litigation Reports, which are currently called "Corporate Management Committee" ("CMC") Reports. As is evident by the face of the representative reports provided by Bard, these reports are communications from Bard's Law Department to Bard's senior management, apprising the corporation of ongoing litigation and providing the corporation with legal advice and services concerning the same. These reports reveal extremely confidential and sensitive litigation information, including, among other things, litigation strategy, status and mental impressions of various cases and claims, and information concerning settlement and settlement negotiations.

(Doc. # 52 at 30 (internal footnote and citations omitted).) As such, Bard maintains Joint Selection 50 is covered by the attorney-client privilege and work product doctrine. (*Id.*)

In support of its position, Bard has provided the affidavit of Ms. Passero, which confirms that Bard's Law Department has prepared these reports on a monthly basis since the 1990s. (Doc. # 52–3 at 5 ¶ 19.) She attests that the reports are distributed by the Law Department only to members of Bard's senior corporate management or to those who need the information to perform their job functions, *i.e.*, risk management, for the purpose of providing legal services to Bard and to provide information concerning ongoing and anticipated litigation. (*Id.* ¶¶ 20–21.)

After reviewing Joint Selection 50, Bard's brief (Doc. # 52) and the affidavit of Ms. Passero (Doc. # 52–3 ¶¶ 19–21), the court concludes that Joint Selection 50 comes within the attorney-client privilege and is protected work product. As a result, Joint Selection 50 need not be produced to Plaintiff.

## VI. CONCLUSION

The court's conclusions regarding the applicable legal standards as well as its preliminary determinations are set forth above. (*See* sections III and IV, respectively, of the Order.) With respect to the Joint Selection documents, the court hereby orders that Bard produce the following to Plaintiff, as

described above: Joint Selections 1, 5, 6, 8, 9, 10, 12, 23, 26, 27, 29, 33, 34, 35, 36, 38 (redacted version as indicated above), 45 and 49. However, entry of the order for production is stayed in the event the parties elect to seek reconsideration and/or review of this order.

The parties are reminded that pursuant to Local Rule IB 3–1, any motion for review of this order by Chief Judge Jones must be filed and served within fourteen days of the date of service of the instant Order. *Id.* Any opposition is due fourteen days thereafter. *Id.*

To be consistent, if either party wishes to file a motion for reconsideration *with the magistrate judge*, such motion must also be filed within fourteen days of service of the instant order, with any opposition due fourteen days thereafter.[4]

If, fourteen days from the date of service of this Order, a motion for reconsideration or motion for review by Chief Judge Jones has not been filed, the portion of this Order regarding production shall go into effect. Alternatively, once the time for filing such motions expires, if a request for review or reconsideration is lodged as to certain aspects of the court's Order regarding production, but not others, the portions of the Order requiring production as to which there is no objection or request for review shall become effective. If an objection or request for review is filed as to certain aspects of the court's Order for production, the court will address the stay as to the entry of the Order as to those aspects of production once the motion has been resolved.

**IT IS SO ORDERED.**

## ORDER

Before the court is Plaintiff Kevin Phillips' (Plaintiff) Motion for Reconsideration Regarding Defendants' Attorney–Client and Work Product Claims[1] (Doc. # 91.)[2] In support of his motion, Plaintiff filed the declaration of Troy Brenes (Doc. # 91–2) and amended declaration of Troy Brenes (Doc. # 92).[3] Plaintiff then filed an errata to his motion to correct typographical errors. (Doc. # 94.) Defendants C.R. Bard, Inc., and Bard Peripheral Vascular, Inc. (collectively, Bard) filed an opposition with supporting exhibits. (Docs. # 97, # 97–1, # 97–2, # 97–3, # 97–4.) Plaintiff then filed a reply brief. (Doc. # 101.)

After a thorough review, and for reasons that will be explained in detail below, Plaintiff's motion (Doc. # 91) is denied.

## I. BACKGROUND

### A. Order Re Bard's Assertion of Attorney Client Privilege & Work Product Doctrine (Doc. # 89)

The factual background and procedural posture of this case which led up to the

---

**4.** While the Federal Rules of Civil Procedure do not contain a provision governing the review of interlocutory orders, "[a]s long as a district court has jurisdiction over the case, then it possesses the inherent procedural power to reconsider, rescind, or modify an interlocutory order for cause seen by it to be sufficient." *City of Los Angeles, Harbor Div. v. Santa Monica Baykeeper*, 254 F.3d 882, 885 (9th Cir.2001) (internal quotation marks and citation omitted) (emphasis omitted) (this power is grounded "in the common law and is not abridged by the Federal Rules of Civil Procedure." *Id.* at 887). In reviewing such motions, this district has utilized the standard for a motion to alter or amend judgment under Rule 59(e). *See, e.g., Henry v. Rizzolo*, No. 2:08–cv–00635–PMP–GWF, 2010 WL 3636278, at *1 (D.Nev. Sept. 10, 2010) (quoting *Evans v. Inmate Calling Solutions*, No. 3:08–cv–00353–RCJ–VPC, 2010 WL 1727841, at *1–2 (D.Nev.2010)). The movant must set forth: "(1) some valid reason why the court should revisit its prior order, and (2) facts or law of a 'strongly convincing nature'

in support of reversing the prior decision." *Rizzolo*, 2010 WL 3636278, at *1 (citing *Frasure v. U.S.*, 256 F.Supp.2d 1180, 1183 (D.Nev.2003)). Moreover, "[r]econsideration is appropriate if the district court (1) is presented with newly discovered evidence, (2) committed clear error or the initial decision was manifestly unjust, or (3) if there is an intervening change in controlling law." *Id.* (quoting *United States Aviation Underwriters v. WesAir, LLC*, No. 2:08–cv–00891–PMP–LRL, 2010 WL 1462707, at *2 (D.Nev. 2010) (internal citation omitted)).

**1.** This motion seeks reconsideration of the court's order set forth at Doc. # 89.

**2.** Refers to court's docket number.

**3.** Exhibit A to each declaration has been sealed via a separate minute order as it contains confidential information that is the subject of a protective order entered in this action.

issuance of the order that is the subject of Plaintiff's motion for reconsideration is set forth in some detail in that order; therefore, the court will not repeat it here. (*See* Doc. # 89 at 1–4.) Suffice it to say that after considering the parties briefing, conducting multiple hearings, and undertaking a substantial review and analysis, the court entered a lengthy order on March 29, 2013, which ruled on the assertion of the attorney-client privilege and work product doctrine by Bard as to fifty representative selections of documents generated by Bard which Plaintiff sought to be produced. (Doc. # 89.) The order also ruled on collateral issues associated with Bard's document production, including the adequacy of Bard's privilege log and waiver. (*Id.*)

## B. Plaintiff's Motion for Reconsideration (Doc. # 91)

Plaintiff subsequently filed the instant motion, asking the court to reconsider certain limited issues pertaining to the following joint selections: 50, 48, 7, 15, 16, 19, 20, 22, 24, 25, 26 and 47. (Doc. # 91.) Plaintiff argues: (1) to the extent Joint Selection 50 contains documents within it that are not protected, Bard should be required to produce these documents; (2) if Joint Selection 48 contains documents that would otherwise not be considered privileged, and were not produced to Plaintiff, then Plaintiff's need for these documents outweighs Bard's work product claim pursuant to Rule 26(b)(3)[4], and to that end, states that Bard should be required to identify any document(s) contained within Joint Selection 48 which was not produced to Plaintiff; (3) Joint Selection 7, an

April 17, 2004 memorandum prepared by Dr. Lehmann to Bard's in-house counsel was prepared prior to the time Dr. Lehmann was hired by Bard's legal department to assist in preparation for litigation, and therefore this document should be produced because it was created in connection with Bard's routine business practices; (4) the court should reconsider its determination that the Remedial Action Plans (RAP) and Health Hazard Evaluation (HHE) that are mentioned or contained within Dr. Lehmann's report because these items were prepared as part of general quality control actions and would have been prepared regardless of litigation as Bard has been preparing these migration failure rate comparisons since at least April 2004, and newly produced evidence from Bard indicates Bard planned to continue to conduct these comparisons after each device failure; (5) multiple courts have already overruled Bard's claims of protection over the HHE attached to Joint Selection 22 and in response to a motion to compel in another case, Bard withdrew its claims of protection over the HHE; (6) Plaintiff has a substantial need under Rule 26(b)(3) for the RAP and HHE materials contained within Dr. Lehmann's report because they directly contradict defenses being asserted by Bard[5] and defense witnesses in this case appear unlikely to have an adequate recollection of the events that took place in 2004[6]; and (7) the theory of waiver by implication applies to Bard's assertion of privilege over these documents because it would be unfair to allow Bard to put these matters at issue by asserting certain defenses and prevent Plaintiff from having access to documents that contradict those defenses.[7] (Doc. # 91.)

---

4. Federal Rule of Civil Procedure 26(b)(3) provides, in part, that a party may obtain discovery of documents prepared in anticipation of litigation by another party or its representative only upon a showing that the party has a "substantial need" for the materials and cannot otherwise obtain them without undue hardship.

5. Plaintiff indicates that Bard is claiming there was no statistically significant difference in the failure rates between its filter and other devices, and even if there was, the comparisons based off of MAUDE data are too unreliable to be helpful, or that the doctors already knew and/or would not have cared about the difference. (Doc. # 91 at 8.) Plaintiff asserts this is evidenced by recent

testimony from Dr. Lehmann as well as the testimony from Dr. Ciavarella, Bard's Medical Affairs Director and author of the HHE from December 2004, but these defenses are contradicted by the prior RAP and HHE. (*Id.* at 8–10.) As will be discussed herein, Bard disputes these are among its defenses.

6. To illustrate this, Plaintiff points to several portions of Dr. Lehmann's deposition transcript where he indicated he had no recollection of certain events.

7. Plaintiff also contends waiver by implication should apply because Bard is selectively claiming that the RAP and HHE from December 2004 and

### C. Bard's Opposition (Doc. # 97)

Bard opposes Plaintiff's motion for reconsideration, arguing: (1) Plaintiff is simply rehashing arguments previously raised and asserts new arguments that he could have raised earlier; (2) no new evidence has been discovered that justifies reconsideration; (3) Plaintiff's claim that Bard cannot raise defenses and then assert privilege over documents is without merit because Bard is only claiming privilege over Dr. Lehmann's report, which was commissioned by the Law Department to assist in litigation, and is not asserting the defenses Plaintiff suggests; and (4) Plaintiff has raised new issues concerning "CMC Notes" that he has not addressed with Bard. (Doc. # 97.)

## II. LEGAL STANDARD FOR RECONSIDERATION

The Federal Rules of Civil Procedure do not contain a provision governing the review of interlocutory orders. "As long as a district court has jurisdiction over the case, then it possesses the inherent procedural power to reconsider, rescind, or modify an interlocutory order for cause seen by it to be sufficient." *City of Los Angeles, Harbor Div. v. Santa Monica Baykeeper*, 254 F.3d 882, 885 (9th Cir.2001) (internal quotation marks and citation omitted) (emphasis omitted). This inherent power is grounded "in the common law and is not abridged by the Federal Rules of Civil Procedure." *Id.* at 887. While other districts in the Ninth Circuit have adopted local rules governing reconsideration of interlocutory orders, the District of Nevada has not. Rather, this district has used the standard for a motion to alter or amend judgment under Rule 59(e). *See, e.g., Henry v. Rizzolo*, No. 2:08–cv–00635–PMP–GWF, 2010 WL 3636278, at *1 (D.Nev. Sept. 10, 2010) (quoting *Evans v. Inmate Calling Solutions*, No. 3:08–cv–00353–RCJ–VPC, 2010 WL 1727841, at *1–2 (D.Nev.2010)).

"A motion for reconsideration must set forth the following: (1) some valid reason why the court should revisit its prior order, and (2) facts or law of a 'strongly convincing nature' in support of reversing the prior decision." *Rizzolo*, 2010 WL 3636278, at *1 (citing *Frasure v. U.S.*, 256 F.Supp.2d 1180, 1183 (D.Nev.2003)). Moreover, "[r]econsideration is appropriate if the district court (1) is presented with newly discovered evidence, (2) committed clear error or the initial decision was manifestly unjust, or (3) if there is an intervening change in controlling law." *Id.* (quoting *United States Aviation Underwriters v. WesAir, LLC*, No. 2:08–cv–00891–PMP–LRL, 2010 WL 1462707, at *2 (D.Nev.2010) (internal citation omitted)).

## III. ANALYSIS

### A. Joint Selection 50

In the order, Joint Selection 50 was described as follows: "Bard's Corporate Management Committee Reports and/or summaries which Bard asserts contain or reflect the Law Department's analysis and summary of ongoing and potential litigation, prepared by Bard's Law Department for the purpose of providing Bard with legal advice and in anticipation and/or in furtherance of litigation." (Doc. # 89 at 65:20–23.) In addition, Bard elaborated on this description with the following:

> Privileged Document No. 50 consists of two exemplar Law Department litigation Reports, which are currently called "Corporate Management Committee" ("CMC") Reports. As is evident by the face of the representative reports provided by Bard, these reports are communications from Bard's Law Department to Bard's senior management, apprising the corporation of ongoing litigation and providing the corporation with legal advice and services concerning the same. These reports reveal extremely confidential and sensitive litigation information, including, among other things, litigation strategy, status and mental impressions of various cases and claims, and information concerning settlement and settlement negotiations.

(Doc. # 89 at 65:25–28 (citing Doc. # 52 at 30 (internal footnote and citations omitted).))

January 2005 are privileged when it did not similarly claim a privilege for the same type of documents from early 2004. (Doc. # 91 at 11–12.)

In his motion for reconsideration, Plaintiff argues that Bard inappropriately designates an unknown number of documents referred to as "Corporate Management Committee Reports" or "CMC Reports" as attorney-client privileged and work product, without indicating whether there are other documents that come within this designation that may not be protected, such as "CMC Notes." (Doc. # 91 at 2.) Plaintiff claims that Bard has produced these "CMC Notes" in other litigation involving its products, and as such asks the court to order Bard to produce two documents that were produced in that litigation from meetings held in February and September of 2004. (*Id.*)

In response, Bard asserts that it is claiming privilege over the "CMC Reports," which are its Corporate Management Committee's reports. (*See* Doc. # 97 at 8, n. 7.) Bard provided the court with two exemplar reports so the court could see the nature of the reports Bard claims are privileged, and has not concealed other documents not subject to the privilege within this designation, as Plaintiff suggests. (*Id.* at 8.) Bard maintains that the "CMC Reports" come within the attorney-client privilege and work product doctrine. In addition, Bard states that it has not refused to indicate whether this designation contains "CMC Notes" as Plaintiff has indicated; rather, Plaintiff never mentioned "CMC Notes" to Bard's counsel prior to filing this motion. (*Id.*) Bard indicates that "CMC Notes," as opposed to "CMC Reports," are an *individual attendee's* personal notes regarding a particular meeting, and Plaintiff and Bard have not met and conferred concerning the production of "CMC Notes." (*Id.*)

Concerning Plaintiff's statement that Bard produced the "CMC Notes" in connection with other litigation, Bard indicates that when Plaintiff suggested that Bard failed to produce responsive documents that were produced in another case, Bard asked Plaintiff's counsel to specify the documents to which he was referring, and Plaintiff's counsel ignored Bard's inquiry. (*Id.*) Bard submits that the parties meet and confer on the issue of the "CMC Notes," which Plaintiff has raised for the first time in this motion so that Bard can

make a determination regarding the materials Plaintiff is requesting. (*Id.* at 9.)

▮ The court reviewed Joint Selection 50 in its entirety, in camera, in making its determination that the "CMC Reports" are protected by the attorney-client privilege and work product doctrine. (Doc. # 89 at 66.) In addition, the court reviewed the declaration of Bard's in-house counsel, Ms. Passero, who confirmed that Bard's Law Department prepared these "CMC Reports" on a monthly basis since the 1990s, that they are distributed only to members of Bard's senior corporate management or others who need the information to perform their job functions, for the purpose of providing legal services to Bard and to provide information concerning ongoing and anticipated litigation. (*Id.* 66:5–10.) As best the court can tell, Joint Selection 50, which has been identified as a "CMC Report," does not contain individual attendee meeting notes which Plaintiff has described as "CMC Notes." Accordingly, the court declines to reconsider its order on Joint Selection 50. Nor does Joint Selection 50 appear to contain any other documents that would not otherwise be privileged. If Plaintiff wishes to pursue production of the "CMC Notes," he should meet and confer with Bard.

## B. Joint Selection 48

Joint Selection 48 was described as: "documents collected by the client at the request of and for use by outside counsel, Richard North, in connection with and in furtherance of ongoing litigation." (Doc. # 89 at 64:6–8.) Bard asserted the work product doctrine and attorney-client privilege protected this joint selection from disclosure. (Doc. # 89 at 64.) In support of its position, it provided the affidavit of Quality Assurance Manager Judith Ludwig, who specifically recounted that in 2005, at the request of Mr. North, she collected and maintained certain documents for his use in connection with his provision of counsel to Bard regarding ongoing litigation, and these materials were kept in a folder titled "Litigation–Richard North." (*Id.*)

Plaintiff maintains that this joint selection contains otherwise non-privileged matters that the court has found subject to protection

because they were gathered at the request of defense counsel in 2005. (Doc. # 91 at 3.) Plaintiff contends that to the extent that documents in this file were not produced, its need for these documents outweighs Bard's work product claim because they presumably relate to Bard's defenses and liability exposure in this case and should be produced pursuant to Rule 26(b)(3).

In his reply brief, Plaintiff states: "Bard should not be allowed to prevent Plaintiff from obtaining relevant evidence by forwarding otherwise non-privileged information to counsel and destroying other copies." (Doc. # 101 at 5.)

█ Plaintiff has not raised any newly discovered evidence or demonstrated that the court committed clear error or was manifestly unjust in its determination with respect to Joint Selection 48; rather, Plaintiff rehashes his previously raised arguments. The court clearly pointed out in its order: "Bard acknowledges that these documents, in and of themselves, are not privileged, and does not assert a privilege to any of the individual documents, but maintains that the file represents the selection and compilation of the documents by Mr. North, as maintained by Ms. Ludwig, and thereby constitute opinion work product protecting the production of the file from discovery." (Doc. # 89 at 64:17–21.) On this basis, the court concluded that litigation file set forth in Joint Selection 48 is protected work product. (*Id.* at 64:22–24.) Plaintiff has not presented any viable reason for the court to reconsider its order as to Joint Selection 48; therefore, his request is denied. Plaintiff may meet and confer with Bard to the extent it is asserting that Joint Selection 48 contains otherwise unprivileged documents that are discoverable but have not been provided.

## C. Joint Selection 7

Joint Selection 7 was described as: "a memorandum dated April 17, 2004, from Dr. Lehmann (consultant) to Donna Passero (Assistant General Counsel), at the direction of Donna Passero concerning a litigation claimant, in anticipation and furtherance of litigation." (Doc. # 89 at 38:27–28, 39:1.) Bard asserts the attorney client privilege and work product doctrine as to Joint Selection 7.

Joint Selection 7 related to a memorandum dated April 17, 2004, from Dr. Lehman to Donna Passero, and Plaintiff contends that at that time, Dr. Lehman was the acting Medical Director for Bard, and Ms. Passero was in-house counsel, and according to Ms. Passero's declaration, Dr. Lehman was not retained by Bard's legal department to assist in preparation for litigation until November of 2004. (Doc. # 91 at 4.) As a result, Plaintiff claims the document could not have been prepared in anticipation of litigation and was only created pursuant to his business role at Bard and should be produced.

█ Plaintiff correctly points out that the memorandum set forth in Joint Selection 7 pre-dates the retention of Dr. Lehmann in November 2004 by Bard's legal department; however, as the court stated in its order, an in camera review of the document reveals that while the memorandum may have pre-dated Dr. Lehmann's formal retention by Bard's legal department, it is clear that it was prepared at the direction of Ms. Passero in anticipation of litigation. Out of an abundance of caution, the court has reviewed Joint Selection again and can confirm that its contents indicate that it was prepared at the direction of Ms. Passero. In addition it is marked attorney-client privileged and confidential. Therefore, the court maintains its conclusion that the document is protected. While Dr. Lehmann may have been providing other consulting services to Bard at that time, it does not change the nature of this specific memorandum.

Accordingly, Plaintiff's request for reconsideration of the court's determination on Joint Selection 7 is denied.

## D. Joint Selections 15, 16, 19, 20, 22, 24, 25, 26 and 47

These joint selections all relate to portions of Dr. Lehmann's report, which the court concluded was prepared at the direction of Bard's legal department in anticipation of litigation. (*See* Doc. # 89 at 44–51, 63.)

### 1. Plaintiff's Argument

First, Plaintiff asks the court to reconsider and/or clarify its decision regarding whether the RAP and HHE contained within Dr. Lehmann's initial report are protected. (Doc. # 91 at 5.) Plaintiff contends that these items were created as part of general quality control actions required by the FDA of all medical device manufacturers, regardless of litigation. (*Id.*) Plaintiff also argues that the work product doctrine does not protect these items because they would have been prepared in substantially similar form even in the absence of the prospect of litigation. (*Id.*) Plaintiff points out that these documents are very similar to the previous RAP and HHEs Bard prepared and over which Bard did not assert claims of privilege or work product protection. (*Id.*) Plaintiff also indicates that one of Bard's previous RAPs, dated April 31, 2004, states that failure rate comparisons would be conducted on a quarterly basis and would be an important factor in deciding the status of the device. (*Id.*) Plaintiff states that newly produced evidence from Bard indicates that it still planned to conduct these comparisons on a monthly basis and after each device failure. (*Id.* at 6.)

Next, Plaintiff asserts that Dr. Lehmann's initial report was actually modified and corrected by Bard's employees as part of the remedial action investigation. (*Id.*) Plaintiff contends that unlike Dr. Lehmann's report, neither the RAP nor the HHE were marked as attorney client privileged or subject to the work product protection. (*Id.*)

Plaintiff also argues that multiple courts have already overruled Bard's claim of protection over the HHE attached to Joint Selection 22. (*Id.* at 7.) In addition, in response to a motion to compel in another case Bard withdrew its claim of protection over the HHE. (*Id.*)

Then, relying on Rule 26(b)(3), Plaintiff contends that he has substantial need to obtain these materials because they directly contradict defenses being asserted by Bard. (Doc. # 91 at 7–11.) Specifically, Plaintiff claims that Bard has asserted among its affirmative defenses that the device was not defectively designed, that it provided adequate warnings, and it was not negligent. (*Id.* at 8.) In connection with these defenses, Plaintiff states that Bard is taking the position that there was no statistically significant difference in the failure rates between the Recovery Filter and other devices, and even if there was, comparisons based off of MAUDE data are too unreliable to be helpful, or that the doctors already knew and/or would not have cared about the difference, so Bard was not responsible for taking the device off the market sooner or for warning physicians about higher failure rates. (*Id.*) Plaintiff indicates that this is apparent from the deposition testimony of Dr. Lehmann and Dr. Ciavarella. (*Id.* at 8–9.)

Plaintiff contends that the RAP and HHE contradict these arguments because they establish that Bard was aware of a statistically significant difference in failure rates between its filter and competitor devices and that the reported adverse event rates were analyzed in conjunction with migration resistance conduct at Bard, thereby concluding that the MAUDE reporting rates and test results contained significant and statistically important safety signals regarding the performance of Bard's filter. (*Id.* at 9–10.) Next, Plaintiff claims that the RAP and HHE actually recommended that physicians be warned of higher failure rates. In addition, Plaintiff maintains that the documents contradict Dr. Ciavarella's claim that MAUDE failure rate comparisons were so unreliable that conclusions could not be drawn from them since the HHE authored by Dr. Ciavarella uses reports from that database to compare Bard's filter's migration rate with competitor filter rates. (*Id.* at 10.) Finally, Plaintiff claims that the documents contradict Dr. Lehmann's assertion that Bard appropriately designed its filter and conducted appropriate post-marketing monitoring. (*Id.*)

Lastly, Plaintiff once again argues implied or "at issue" waiver, *i.e.*, that Bard has asserted defenses and then claims that documents contradicting those defenses are privileged, and this is unfair. (Doc. # 91 at 11–12.)

### 2. Bard's Response

First, Bard asserts that Plaintiff has not come forward with "newly produced evi-

dence" to support its motion for reconsideration concerning this joint selection. (Doc. # 97 at 2, 5–6.) The evidence Plaintiff provides includes an email and an attachment that Bard produced to Plaintiff on September 10, 2012. (*Id.* at 5.) Moreover, Bard argues that this email and attachment only go to support Plaintiff's argument that Dr. Lehmann's report and the RAP resemble work conducted by Bard earlier in 2004, which is an argument Plaintiff already advanced and rejected by the court. (*Id.* at 6.) To the extent Plaintiff takes the position that Dr. Lehmann's deposition testimony constitutes newly discovered evidence, Bard maintains that Dr. Lehmann's testimony does not contradict the underlying basis of Bard's work product claim—that the report was prepared at the direction of Bard's legal department in anticipation of litigation. (*Id.*)

Next, Bard states that it has made clear to Plaintiff that it is not asserting privilege over any portion of the HHE and has provided Plaintiff's counsel with the unredacted HHE. (*Id.* at 3, n. 1, 4.) With respect to the redacted portions of the RAP contained within Dr. Lehmann's report, Bard is only claiming privilege over Dr. Lehmann's report and the limited portions of the RAP that directly reflect and/or quote from the report. (*Id.* at 7.) Bard maintains that it is protected work product, regardless of whether it resembles prior work conducted by Dr. Lehmann that is not privileged, because this particular report was prepared at the direction of Bard's law department to assist with litigation. (*Id.* at 3–4.)

Bard contends that Plaintiff does not have a substantial need for these documents because Bard has provided Plaintiff with an unredacted version of the HHE, and Plaintiff can obtain information concerning Bard's knowledge and conduct in 2004, by reviewing the millions of pages of documents produced to Plaintiff by Bard, including its internal complaint files involving filter migration and other filter complications as well as internal investigations and analyses regarding the filter. (*Id.* at 4.) In addition, Plaintiff can depose Bard representatives on these issues. (*Id.*) Bard argues that Plaintiff's assertion that the defense witnesses appear unlikely to

have an adequate recollection of events, based on the deposition of one witness—Dr. Lehmann—who had intermittent interaction with Bard since 2004, should be rejected. (*Id.* at 5 n. 3.)

Finally, Bard claims that Plaintiff's waiver argument fails because Bard has not asserted the positions Plaintiff represents in his motion, *i.e.*, that there was no statistically significant difference in the failure rates between Bard's filter and competitor filters, that doctors already knew and/or would not have cared about the difference. (*Id.*) Bard points out that Dr. Lehmann was deposed in his individual capacity, as a non-employee consultant to Bard; therefore, his testimony does not bind Bard in this litigation (presumably it means with respect to its assertion of defenses). (*Id.* n. 6.)

### 3. Plaintiff's Reply

In his reply, Plaintiff states that his motion is supported by newly obtained evidence, including the deposition testimony of Dr. Lehmann, Rob Carr, and Dr. Ciavarella, and a relevant e-mail indicating that as of August 2004, Bard was still doing monthly failure rate comparisons. (Doc. # 101 at 2.) Plaintiff concedes that Rob Carr's deposition was previously produced to him, but it was buried in a document production consisting of millions of pages of documents. (*Id.*) He makes a similar claim regarding the e-mail that he contends was newly produced evidence. (*Id.*)

Plaintiff then argues that each of his arguments were properly raised in his underlying briefing. (*Id.* at 2–3.)

Next, Plaintiff argues that the blanket assertion with respect to the documents in Joint Selection 50, which pertains to the CMC Reports, is inappropriate. (*Id.* at 3.) Plaintiff wants Bard to represent whether the designation contains documents other than the CMC reports. Plaintiff disputes that he has not raised the issue of the "CMC Notes" with Bard prior to this motion. (*Id.* at 4.)

Plaintiff reiterates his argument that the Remedial Action Plans were not created because of litigation as well as his argument

regarding application of the implied waiver doctrine and his asserted substantial need for this information. (Doc. # 101 at 5–11.)

### 4. Analysis

First, the court notes that Bard represents that it is *not* asserting privilege over any portion of the HHE, and that it has produced an unredacted copy of the HHE to Plaintiff. (Doc. # 97 at 3 n. 1, stating that on January 23, 2013, Bard provided Plaintiff's counsel with documents that included the January 4, 2005 Remedial Action Plan, which includes the unredacted HHE, and Ex. A to Bard's response.) Therefore, to the extent Plaintiff is requesting that the court reconsider its order on the basis that Dr. Lehmann's report contains portions of the HHE, that argument is moot.

 Second, the court agrees with Bard that Plaintiff's argument that Dr. Lehmann's report (that the court concluded was protected work product) would have been produced regardless of ongoing litigation, and was similar to his earlier work, was previously asserted by Plaintiff in connection with its original briefing on these issues. (*See, e.g.*, Doc. # 54 at 6–10, Doc. # 64 at 19–20.) Plaintiff specifically argued in its original briefing on this issue that "Dr. Lehman was asked to perform basically the same work he had been previously tasked with doing as the consulting Corporate Medical director in support of remedial action investigations, including the preparation of what was in essence a HHE." (Doc. # 54 at 9:15–18.) "[M]otions for reconsideration are not the proper vehicles for rehashing old arguments and are not intended to give an unhappy litigant one additional chance to sway the judge." *Cheffins v. Stewart*, No. 3:09–cv–00130–RAM, 2011 WL 1233378, at *1 (D.Nev. Mar. 29, 2011) (quoting *Sw. Circle Group, Inc. v. Perini Bldg. Co.*, 2010 WL 4606999, at *1 (D.Nev. Nov. 5, 2010). The court similarly agrees with Defendants that to the extent Plaintiff presents the court with additional information that could have been presented in connection with his original briefing on this issue, his request for reconsideration is improper on this basis. "[A] motion for reconsideration 'may *not* be used to raise arguments or present evidence for the first time when they could reasonably have been raised earlier in the litigation.'" *Id.*, at *1 (quoting *Kona Enters., Inc. v. Estate of Bishop*, 229 F.3d 877, 890 (9th Cir.2000) (italics original))).

 Nevertheless, the court declines to reconsider its ruling with respect to Joint Selection 50. As the court discussed in its order, Bard submitted the affidavit of its in-house counsel, Ms. Passero, who attests that Dr. Lehmann was retained by Bard's legal department in early November 2004 regarding anticipated and ongoing product liability litigation, for the specific purpose of conducting an independent investigation and drafting a report concerning the filter at issue, so that she and Bard's legal department could provide Bard with legal advice concerning the filter and to prepare for and assist with anticipated and ongoing litigation. (*See* Doc. # 89 at 18.) No one disputes that Dr. Lehmann worked in the capacity of a medical consultant for Bard prior to his retention by the legal department in November of 2004. Plaintiff effectively claims, however, that this is a "dual purpose" document (discussed in the court's order at Doc. # 89 at 22–24), i.e., a document prepared in anticipation of litigation and for another purpose such as a general business purpose. In analyzing the application of the work product doctrine to a "dual purpose" document, the court must apply the "because of" test and "[d]ual purpose documents are deemed prepared *because of* litigation if 'in light of the nature of the document and the factual situation in the particular case, the document can be fairly said to have been prepared or obtained because of the prospect of litigation.'" *United States v. Richey*, 632 F.3d 559, 567–68 (9th Cir.2011) (citation omitted) (emphasis added). In applying this standard, "'the nature of the document *and* the factual situation of the particular case' are key to a determination of whether work product protection applies." *In re Grand Jury Subpoena (Mark Torf/Torf Envtl. Mgmt.)* (referred to herein as *Torf*), 357 F.3d 900, 908 (9th Cir.2004) (emphasis original) (citation omitted).

While Dr. Lehmann may have conducted similar investigatory work and analyses prior

to his retention by Bard's legal department in 2004, including the preparation of RAPs, the court maintains its conclusion that Dr. Lehmann's report, and the redacted portion of the RAP, is protected work product. The court made this conclusion considering the circumstances surrounding the creation of the report, including that Bard received its first product liability claim concerning this filter in February 2004 (*see* Doc. # 52 at 19 n. 12), and by November 2004, when Dr. Lehmann was retained, it had received multiple product liability claims concerning its filter. (*See id.*) Ms. Passero states that Dr. Lehmann was retained at this time in light of anticipated and ongoing product liability litigation, for the specific purpose of conducting an independent investigation and drafting a report concerning the filter at issue, so that she and Bard's legal department could provide Bard with legal advice concerning the filter and to prepare for and assist with anticipated and ongoing litigation. While Dr. Lehmann may have conducted similar work prior to his retention by the law department, this type of analysis seems to be highly critical in the face of multiple product liability claims concerning the filter. With this information in mind, the court finds that "the litigation purpose so permeates any nonlitigation purpose that the two purposes cannot be discretely separated from the factual nexus as a whole." *Torf,* 357 F.3d at 910. Therefore, Dr. Lehmann's report, including the redacted portion of the RAP that quotes his report, is protected work product.

■■■ Nor is the court persuaded by Plaintiff's argument that it should invoke Plaintiff's waiver analysis or make a determination that precluding this production is manifestly unjust or that there is a substantial need for the documents because Bard is asserting various affirmative defenses that are contradicted by these documents. First, Plaintiff has already made and the court has already rejected this argument. Second, Bard has affirmatively stated in its opposition that it has not asserted the positions Plaintiff suggests. As it stated in the original order, it is not readily apparent that Bard will be relying on any specific documents it has withheld in order to support its defenses. (Doc. # 89 at 30.) When and if it becomes clear that Bard intends to do so, as the court previously

discussed, Plaintiff is not without a remedy. (*Id.* at 30–31.) Moreover, to the extent this argument is predicated on a substantial need for the HHE, Bard has produced this information to Plaintiff. (*See* Doc. # 97 at 4.) With respect to an asserted substantial need for the information contained within the RAP, the court agrees with Bard that Plaintiff has various avenues of gaining access to the information he seeks to support his claim, including Bard's internal complaint files involving filter migration, and other filter complications, internal investigation and analyses from 2004 involving the filter which includes other remedial action plans, failure investigation reports, and other HHE reports, not to mention his ability to depose various Bard employees and consultants about this information. While Plaintiff suggests that defense witnesses are unlikely to be able to recall these details, the court does not find this argument persuasive when Plaintiff bases it on the citation to certain responses of a single witness.

Accordingly, Plaintiff's motion for reconsideration of the court's determination that Joint Selection 50 is protected work product is denied.

### IV. CONCLUSION

Plaintiff's motion for reconsideration of the court's order relating to Bard's assertion of the attorney-client privilege and work product doctrine (Doc. # 91) is ***DENIED.***

**IT IS SO ORDERED.**